# COUNTY OF ALLEGHENY ET AL. *v.* AMERICAN CIVIL LIBERTIES UNION, GREATER PITTSBURGH CHAPTER, ET AL.

No. 87–2050.   Argued February 22, 1989—Decided July 3, 1989*

*Together with No. 88–90, *Chabad* v. *American Civil Liberties Union et al.*, and No. 88–96, *City of Pittsburgh* v. *American Civil Liberties Union, Greater Pittsburgh Chapter, et al.*, also on certiorari to the same court.

576

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts III–A, IV, and V, in which BRENNAN, MARSHALL, STEVENS, and O'CONNOR, JJ., joined, an opinion with respect to Parts I and II, in which STEVENS and O'CONNOR, JJ., joined, an opinion with respect to Part III–B, in which STEVENS, J., joined, an opinion with respect to Part VII, in which O'CONNOR, J., joined, and an opinion with respect to Part VI. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in Part II. of which BRENNAN and STEVENS, JJ., joined, post, p. 623. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and STEVENS, JJ., joined, post, p. 637. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, post, p. 646. KENNEDY, J., filed an opinion concurring in the judgment in part and dissenting in part, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined, post, p. 655.

*Peter Buscemi* argued the cause for petitioners in Nos. 87–2050 and 88–96. With him on the briefs were *George M. Janocsko, Robert L. McTiernan, D. R. Pellegrini,* and *George*

*R. Specter.* Nathan Lewin argued the cause for petitioner in No. 88–90. With him on the briefs was *Charles H. Saul.*

*Roslyn M. Litman* argued the cause for respondents. With her on the brief for respondents American Civil Liberties Union et al. were *Jon Pushinsky, James B. Lieber, John A. Powell,* and *Steven R. Shapiro. Ruti Teitel, Jeffrey P. Sinensky, Steven M. Freeman, Richard E. Shevitz,* and *Jill L. Kahn* filed a brief for respondent Tunador.†

JUSTICE BLACKMUN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts III–A, IV, and V, an opinion with respect to Parts I and II, in which JUSTICE STEVENS and JUSTICE O'CONNOR join, an opinion with respect to Part III–B, in which JUSTICE STEVENS joins, an opinion with respect to Part VII, in which JUSTICE O'CONNOR joins, and an opinion with respect to Part VI.

This litigation concerns the constitutionality of two recurring holiday displays located on public property in downtown Pittsburgh. The first is a crèche placed on the Grand Staircase of the Allegheny County Courthouse. The second is a Chanukah menorah placed just outside the City-County Building, next to a Christmas tree and a sign saluting liberty. The Court of Appeals for the Third Circuit ruled that each display violates the Establishment Clause of the First Amendment because each has the impermissible effect of endorsing re-

---

†Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Deputy Solicitor General Ayer,* and *Michael K. Kellogg;* for the city of Warren, Michigan, by *Robert E. Williams;* for Concerned Women for America by *Jordan W. Lorence, Cimron Campbell,* and *Wendell R. Bird;* for the National Jewish Commission on Law and Public Affairs by *Dennis Rapps* and *A. David Stern;* and for the National Legal Foundation by *Douglas W. Davis, Robert K. Skolrood,* and *William C. Wood, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Committee et al. by *Samuel Rabinove, Richard T. Foltin, James G. Greilsheimer, Alan M. Klinger, David A. Stein, Lauren G. Klein,* and *Lee Boothby;* and for the American Jewish Congress et al. by *Arlene Fickler, Marc D. Stern, Lois C. Waldman,* and *Amy Adelson.*

ligion. 842 F. 2d 655 (1988). We agree that the crèche display has that unconstitutional effect but reverse the Court of Appeals' judgment regarding the menorah display.

## I

## A

The county courthouse is owned by Allegheny County and is its seat of government. It houses the offices of the county commissioners, controller, treasurer, sheriff, and clerk of court. Civil and criminal trials are held there. App. 69. The "main," "most beautiful," and "most public" part of the courthouse is its Grand Staircase, set into one arch and surrounded by others, with arched windows serving as a backdrop. *Id.*, at 157–158; see Joint Exhibit Volume (JEV) 31.

Since 1981, the county has permitted the Holy Name Society, a Roman Catholic group, to display a crèche in the county courthouse during the Christmas holiday season. App. 164. Christmas, we note perhaps needlessly, is the holiday when Christians celebrate the birth of Jesus of Nazareth, whom they believe to be the Messiah.[1] Western churches have celebrated Christmas Day on December 25 since the fourth century.[2] As observed in this Nation, Christmas has a secular, as well as a religious, dimension.[3]

---

[1] See 8 Encyclopedia of Religion, "Jesus," 15, 18 (1987).

[2] See 3 Encyclopedia of Religion, "Christmas," 460 (1987). Some eastern churches, however, have not adopted December 25 as the Feast of the Nativity, retaining January 6 as the date for celebrating both the birth and the baptism of Jesus. R. Myers, Celebrations: The Complete Book of American Holidays 15, 17 (1972) (Myers).

[3] "[T]he Christmas holiday in our national culture contains both secular and sectarian elements." *Lynch* v. *Donnelly*, 465 U. S. 668, 709, and n. 15 (1984) (BRENNAN, J., dissenting). It has been suggested that the cultural aspect of Christmas in this country now exceeds the theological significance of the holiday. See J. Barnett, The American Christmas, a Study in National Culture 23 (1954) (Barnett) ("[B]y the latter part of the last century, the folk-secular aspects of Christmas were taking precedence over its religious ones").

The crèche in the county courthouse, like other crèches, is a visual representation of the scene in the manger in Bethlehem shortly after the birth of Jesus, as described in the Gospels of Luke and Matthew.[4]   The crèche includes figures of the infant Jesus, Mary, Joseph, farm animals, shepherds, and wise men, all placed in or before a wooden representation of a manger, which has at its crest an angel bearing a banner that proclaims "Gloria in Excelsis Deo!"[5]

During the 1986–1987 holiday season, the crèche was on display on the Grand Staircase from November 26 to January 9.   App. 15, 59.   It had a wooden fence on three sides and bore a plaque stating: "This Display Donated by the Holy Name Society."   Sometime during the week of December 2, the county placed red and white poinsettia plants around the fence.   Id., at 96.   The county also placed a small evergreen tree, decorated with a red bow, behind each of the two endposts of the fence.   Id., at 204; JEV 7.[6]   These trees stood alongside the manger backdrop and were slightly shorter than it was.   The angel thus was at the apex of the crèche display.   Altogether, the crèche, the fence, the poinsettias, and the trees occupied a substantial amount of space on the Grand Staircase.   No figures of Santa Claus or other decora-

---

[4] Luke 2:1–21; Matthew 2:1–11.

[5] This phrase comes from Luke, who tells of an angel appearing to the shepherds to announce the birth of the Messiah.   After the angel told the shepherds that they would find the baby lying in a manger, "suddenly there was with the angel a multitude of the heavenly host praising God, and saying, Glory to God in the highest, and on earth peace, good will towards men."   Luke 2:13–14 (King James Version).   It is unlikely that an observer standing at the bottom of the Grand Staircase would be able to read the text of the angel's banner from that distance, but might be able to do so from a closer vantage point.

[6] On each side of the staircase was a sign indicating the direction of county offices.   JEV 7–8.   A small evergreen tree, decorated much like the trees behind the endposts, was placed next to each directional sign. Ibid.

tions appeared on the Grand Staircase. App. 188.[7] Cf. *Lynch* v. *Donnelly*, 465 U. S. 668, 671 (1984). Appendix A at the end of this opinion is a photograph of the display.

The county uses the crèche as the setting for its annual Christmas-carol program. See JEV 36. During the 1986 season, the county invited high school choirs and other musical groups to perform during weekday lunch hours from December 3 through December 23. The county dedicated this program to world peace and to the families of prisoners-of-war and of persons missing in action in Southeast Asia. App. 160; JEV 30.

Near the Grand Staircase is an area of the county courthouse known as the "gallery forum" used for art and other cultural exhibits. App. 163. The crèche, with its fence-and-floral frame, however, was distinct and not connected with any exhibit in the gallery forum. See Tr. of Oral Arg. 7 (the forum was "not any kind of an integral part of the Christmas display"); see also JEV 32–34. In addition, various departments and offices within the county courthouse had their own Christmas decorations, but these also are not visible from the Grand Staircase. App. 167.

## B

The City-County Building is separate and a block removed from the county courthouse and, as the name implies, is jointly owned by the city of Pittsburgh and Allegheny County. The city's portion of the building houses the city's principal offices, including the mayor's. *Id.*, at 17. The city is responsible for the building's Grant Street entrance which has three rounded arches supported by columns. *Id.*, at 194, 207.

For a number of years, the city has had a large Christmas tree under the middle arch outside the Grant Street entrance. Following this practice, city employees on Novem-

---

[7] In the arched windows behind the staircase were two large wreaths, each with a large red ribbon. *Ibid.*

ber 17, 1986, erected a 45-foot tree under the middle arch and decorated it with lights and ornaments. *Id.*, at 218–219. A few days later, the city placed at the foot of the tree a sign bearing the mayor's name and entitled "Salute to Liberty." Beneath the title, the sign stated:

> "During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom." JEV 41.

At least since 1982, the city has expanded its Grant Street holiday display to include a symbolic representation of Chanukah, an 8-day Jewish holiday that begins on the 25th day of the Jewish lunar month of Kislev. App. 138.[8] The 25th of Kislev usually occurs in December,[9] and thus Chanukah is the annual Jewish holiday that falls closest to Christmas Day each year. In 1986, Chanukah began at sundown on December 26. *Id.*, at 138–139.

According to Jewish tradition, on the 25th of Kislev in 164 B.C.E. (before the common era (165 B.C.)), the Maccabees rededicated the Temple of Jerusalem after recapturing it from the Greeks, or, more accurately, from the Greek-influenced Seleucid Empire, in the course of a political rebellion. *Id.*,

---

[8] See generally A. Bloch, The Biblical and Historical Background of the Jewish Holy Days 49–78 (1978) (Bloch, Holy Days); A. Bloch, The Biblical and Historical Background of Jewish Customs and Ceremonies 267–278 (1980) (Bloch, Ceremonies); 6 Encyclopedia of Religion, "Hanukkah," 193–194; 7 Encyclopaedia Judaica, "Hanukkah," 1280–1288 (1972); O. Rankin, The Origins of the Festival of Hanukkah (1930) (Rankin); A. Chill, The Minhagim 241–254 (1979) (Chill); L. Trepp, The Complete Book of Jewish Observance 137–151 (1980) (Trepp); M. Strassfeld, The Jewish Holidays 161–177 (1985) (Strassfeld).

[9] See Columbia Encyclopedia 1190 (4th ed. 1975); J. Williams, What Americans Believe and How they Worship 348 (3d ed. 1969); Myers 302; see also Strassfeld 202; see generally A. Spier, The Comprehensive Hebrew Calendar (1981).

at 138.[10]  Chanukah is the holiday which celebrates that event.[11]  The early history of the celebration of Chanukah is unclear; it appears that the holiday's central ritual—the lighting of lamps—was well established long before a single explanation of that ritual took hold.[12]

The Talmud[13] explains the lamplighting ritual as a commemoration of an event that occurred during the rededication of the Temple.  The Temple housed a seven-branch menorah,[14] which was to be kept burning continuously.  *Id.*, at 139, 144.  When the Maccabees rededicated the Temple, they had only enough oil to last for one day.  But, according to the Talmud, the oil miraculously lasted for eight days (the length of time it took to obtain additional oil).  *Id.*, at 139.[15]  To celebrate and publicly proclaim this miracle, the Talmud prescribes that it is a mitzvah (*i. e.*, a religious deed or commandment), *id.*, at 140,[16] for Jews to place a lamp with eight lights just outside the entrance to their homes or in a front window during the eight days of Chanukah.  *Id.*, at

---

[10] See P. Johnson, A History of the Jews 104 (1987) (Johnson); R. Seltzer, Jewish People, Jewish Thought: The Jewish Experience in History 158 (1980) (Seltzer).

[11] The word Chanukah, sometimes spelled Chanukkah or Hanukkah, is drawn from the Hebrew for "dedication."  7 Encyclopaedia Judaica 1280.

[12] See Strassfeld 161–163; Rankin 133.

[13] The Talmud (specifically the Babylonian Talmud) is a collection of rabbinic commentary on Jewish law that was compiled before the sixth century, App. 140.  See 14 Encyclopedia of Religion, "Talmud," 256–259; see also Seltzer 265.

[14] "Menorah" is Hebrew for "candelabrum."  See 11 Encyclopaedia Judaica, "Menorah," at 1356.

[15] See The Babylonian Talmud, Seder Mo'ed, 1 Shabbath 21b (Soncino Press 1938); Strassfeld 163; Trepp 143.

[16] Cf. "Mitzvah," in 12 Encyclopaedia Judaica 162 (4th ed., 1972) ("In common usage, *mitzvah* has taken on the meaning of a good deed.  Already in the Talmud, this word was used for a meritorious act as distinct from a positive commandment").  The plural of mitzvah is mitzvot.

147.[17]   Where practicality or safety from persecution so re-
quires, the lamp may be placed in a window or inside the
home.[18]   The Talmud also ordains certain blessings to be re-
cited each night of Chanukah before lighting the lamp.[19]   One
such benediction has been translated into English as "We are
blessing God who has sanctified us and commanded us with
mitzvot and has told us to light the candles of Hanukkah."
*Id.*, at 306.[20]

Although Jewish law does not contain any rule regarding
the shape or substance of a Chanukah lamp (or "hanuk-
kiyyah"), *id.*, at 146, 238,[21] it became customary to evoke
the memory of the Temple menorah.   *Id.*, at 139, 144.   The
Temple menorah was of a tree-and-branch design; it had a
central candlestick with six branches.   *Id.*, at 259.[22]   In
contrast, a Chanukah menorah of tree-and-branch design has
eight branches—one for each day of the holiday—plus a ninth
to hold the shamash (an extra candle used to light the other
eight).   *Id.*, at 144.[23]   Also in contrast to the Temple meno-
rah, the Chanukah menorah is not a sanctified object; it need
not be treated with special care.[24]

---

[17] See also Bloch, Ceremonies 269.   According to some Jewish authori-
ties the miracle of Chanukah is the success of the Maccabees over the
Seleucids, rather than the fact that the oil lasted eight days.   App. 141.
Either way, the purpose of lighting the Chanukah candles, as a religious
mitzvah, is to celebrate a miracle.   *Ibid.*

[18] Trepp 146; 7 Encyclopaedia Judaica 1283; Talmud Shabbath 21b.

[19] Bloch, Ceremonies 274.

[20] Another translation is "Praised are you, Lord our God, Ruler of the
universe, who has sanctified our lives through His commandments, com-
manding us to kindle the Hanukkah lights."   Strassfeld 167.

[21] Trepp 145; see generally 7 Encyclopaedia Judaica, "Hanukkah Lamp,"
1288–1316.

[22] The design of the menorah is set forth in Exodus 25:31–40; see also 11
Encyclopaedia Judaica 1356–1370.

[23] Bloch, Ceremonies 274–275.

[24] A Torah scroll—which contains the five Books of Moses—must be bur-
ied in a special manner when it is no longer usable.   App. 237–238.

Lighting the menorah is the primary tradition associated with Chanukah, but the holiday is marked by other traditions as well. One custom among some Jews is to give children Chanukah gelt, or money.[25] Another is for the children to gamble their gelt using a dreidel, a top with four sides. Each of the four sides contains a Hebrew letter; together the four letters abbreviate a phrase that refers to the Chanukah miracle. *Id.*, at 241–242.[26]

Chanukah, like Christmas, is a cultural event as well as a religious holiday. *Id.*, at 143. Indeed, the Chanukah story always has had a political or national, as well as a religious, dimension: it tells of national heroism in addition to divine intervention.[27] Also, Chanukah, like Christmas, is a winter holiday; according to some historians, it was associated in ancient times with the winter solstice.[28] Just as some Americans celebrate Christmas without regard to its religious significance, some nonreligious American Jews celebrate Chanukah as an expression of ethnic identity, and "as a cultural or national event, rather than as a specifically religious event." *Ibid.*[29]

---

[25] Strassfeld 167; Bloch, Ceremonies 277.

[26] *Id.*, at 277–278; Trepp 147. It is also a custom to serve potato pancakes or other fried foods on Chanukah because the oil in which they are fried is, by tradition, a reminder of the miracle of Chanukah. App. 242–243; Strassfeld 168.

[27] *Id.*, at 164. .

[28] Trepp 144, 150; 6 Encyclopedia of Religion 193; see also Strassfeld 176. Of course, the celebration of Christmas and Chanukah in the Southern Hemisphere occurs during summer. Nonetheless, both Christmas and Chanukah first developed in the Northern Hemisphere and have long-standing cultural associations with the beginning of winter. In fact, ancient rabbis chose Chanukah as the means to mark the beginning of winter. See Bloch, Holy Days 77.

[29] See also App. 229, 237. The Court of Appeals in this litigation plainly erred when it asserted that Chanukah "is not . . . a holiday with secular aspects." 842 F. 2d 655, 662 (CA3 1988). This assertion contradicts uncontroverted record evidence presented by respondents' own expert witness:

The cultural significance of Chanukah varies with the setting in which the holiday is celebrated. In contemporary Israel, the nationalist and military aspects of the Chanukah story receive special emphasis.[30] In this country, the tradition of giving Chanukah gelt has taken on greater importance because of the temporal proximity of Chanukah to Christmas.[31] Indeed, some have suggested that the proximity of Christmas accounts for the social prominence of Chanukah in this country.[32] Whatever the reason, Chanukah is observed by American Jews to an extent greater than its religious im-

---

"There are also those Jews within the Jewish community who are non-theistic. . . . [T]hey base their celebration [of Chanukah] on something other than religion." App. 143.

In response to further questioning, the expert added that the celebration of Chanukah as a cultural event "certainly exists." *Ibid.* Thus, on this record, Chanukah unquestionably has "secular aspects," although it is also a religious holiday. See Chill 241 (Chanukah is celebrated by secular as well as religious Jews).

[30] Strassfeld 164–165; see also 7 Encyclopaedia Judaica 1288.

[31] "In America, Hanukkah has been influenced by the celebration of Christmas. While a tradition of giving Hanukkah gelt—money—is an old one, the proximity to Christmas has made gift giving an intrinsic part of the holiday." Strassfeld 164.

[32] "In general, the attempt to create a Jewish equivalent to Christmas has given Hanukkah more significance in the festival cycle than it has had in the past." *Ibid.* "Hanukkah has prospered because it comes about the same time as Christmas and can be used as the Jewish equivalent." D. Elazar, Community and Polity: The Organizational Dynamics of American Jewry 119 (1976). "Hanukkah was elaborated by American Jews to protect the child and to defend Judaism against the glamour and seductive power of Christmas." C. Liebman, The Ambivalent American Jew 66 (1973). See also M. Sklare & J. Greenblum, Jewish Identity on the Suburban Frontier 58 (1967):

"The aspects of Hanukkah observance currently emphasized—the exchange of gifts and the lighting and display of the *menorah* in the windows of homes—offer ready parallels to the general mode of Christmas observance as well as provide a 'Jewish' alternative to the holiday. Instead of alienating the Jew from the general culture, Hanukkah helps situate him as a participant in that culture. Hanukkah, in short, becomes for some the Jewish Christmas."

portance would indicate: in the hierarchy of Jewish holidays, Chanukah ranks fairly low in religious significance.[33] This socially heightened status of Chanukah reflects its cultural or secular dimension.[34]

On December 22 of the 1986 holiday season, the city placed at the Grant Street entrance to the City-County Building an 18-foot Chanukah menorah of an abstract tree-and-branch design. The menorah was placed next to the city's 45-foot Christmas tree, against one of the columns that supports the arch into which the tree was set. The menorah is owned by Chabad, a Jewish group,[35] but is stored, erected, and removed each year by the city. *Id.*, at 290; see also Brief for Petitioner in No. 88–96, p. 4. The tree, the sign, and the menorah were all removed on January 13. App. 58, 220–221. Appendix B, p. 622, is a photograph of the tree, the sign, and the menorah. App. 212; JEV 40.

## II

This litigation began on December 10, 1986, when respondents, the Greater Pittsburgh Chapter of the American Civil Liberties Union and seven local residents, filed suit against the county and the city, seeking permanently to enjoin the county from displaying the crèche in the county courthouse and the city from displaying the menorah in front of the City-

---

[33] See Chill 241 (from the perspective of Jewish religious law, Chanukah is "only a minor festival").

[34] Additionally, menorahs—like Chanukah itself—have a secular as well as a religious dimension. The record in this litigation contains a passing reference to the fact that menorahs "are used extensively by secular Jewish organizations to represent the Jewish people." App. 310.

[35] Chabad, also known as Lubavitch, is an organization of Hasidic Jews who follow the teachings of a particular Jewish leader, the Lubavitch Rebbe. *Id.*, at 228, 253–254. The Lubavitch movement is a branch of Hasidism, which itself is a branch of orthodox Judaism. *Id.*, at 249–250. Pittsburgh has a total population of 45,000 Jews; of these, 100 to 150 families attend synagogue at Pittsburgh's Lubavitch Center. *Id.*, at 247–251.

County Building.[36]  Respondents claim that the displays of the crèche and the menorah each violate the Establishment Clause of the First Amendment, made applicable to state governments by the Fourteenth Amendment.  See *Wallace* v. *Jaffree*, 472 U. S. 38, 48–55 (1985).[37]  Chabad was permitted to intervene to defend the display of its menorah.[38]

On May 8, 1987, the District Court denied respondents' request for a permanent injunction.  Relying on *Lynch* v. *Donnelly*, 465 U. S. 668 (1984), the court stated that "the crèche was but part of the holiday decoration of the stairwell and a foreground for the highschool choirs which entertained each day at noon."  App. to Pet. for Cert. in No. 87–2050, p. 4a. Regarding the menorah, the court concluded that "it was but an insignificant part of another holiday display."  *Ibid.*  The court also found that "the displays had a secular purpose" and "did not create an excessive entanglement of government with religion."  *Id.*, at 5a.

Respondents appealed, and a divided panel of the Court of Appeals reversed.  842 F. 2d 655 (CA3 1988).  Distinguishing *Lynch* v. *Donnelly*, the panel majority determined that the crèche and the menorah must be understood as endorsing Christianity and Judaism.  The court observed: "Each display was located at or in a public building devoted

---

[36] Respondents also sought a preliminary injunction against the display of the crèche and menorah for the 1986–1987 holiday season.  Characterizing the crèche and menorah as "de minimis in the context of the First Amendment," the District Court on December 15 denied respondents' motion for preliminary injunctive relief.  *Id.*, at 10.

[37] Respondents, however, do not claim that the city's Christmas tree violates the Establishment Clause and do not seek to enjoin its display. Respondents also do not claim that the county's Christmas-carol program is unconstitutional.  See Tr. of Oral Arg. 32.

[38] In addition to agreeing with the city that the menorah's display does not violate the Establishment Clause, Chabad contends that it has a constitutional right to display the menorah in front of the City-County Building.  In light of the Court's disposition of the Establishment Clause question as to the menorah, there is no need to address Chabad's contention.

to core functions of government." 842 F. 2d, at 662. The court also stated: "Further, while the menorah was placed near a Christmas tree, neither the crèche nor the menorah can reasonably be deemed to have been subsumed by a larger display of non-religious items." *Ibid.* Because the impermissible effect of endorsing religion was a sufficient basis for holding each display to be in violation of the Establishment Clause under *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), the Court of Appeals did not consider whether either one had an impermissible purpose or resulted in an unconstitutional entanglement between government and religion.

The dissenting judge stated that the crèche, "accompanied by poinsettia plants and evergreens, does not violate the Establishment Clause simply because plastic Santa Clauses or reindeer are absent." 842 F. 2d, at 670. As to the menorah, he asserted: "Including a reference to Chanukah did no more than broaden the commemoration of the holiday season and stress the notion of sharing its joy." *Id.,* at 670–671.

Rehearing en banc was denied by a 6-to-5 vote. See App. to Pet. for Cert. in No. 87–2050, p. 45a. The county, the city, and Chabad each filed a petition for certiorari. We granted all three petitions. 488 U. S. 816 (1988).

### III

#### A

This Nation is heir to a history and tradition of religious diversity that dates from the settlement of the North American Continent. Sectarian differences among various Christian denominations were central to the origins of our Republic. Since then, adherents of religions too numerous to name have made the United States their home, as have those whose beliefs expressly exclude religion.

Precisely because of the religious diversity that is our national heritage, the Founders added to the Constitution a Bill of Rights, the very first words of which declare: "Congress shall make no law respecting an establishment of religion, or

prohibiting the free exercise thereof . . . ." Perhaps in the early days of the Republic these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to "the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism." *Wallace* v. *Jaffree*, 472 U. S., at 52.[39] It is settled law that no government official in this Nation may violate these fundamental constitutional rights regarding matters of conscience. *Id.*, at 49.

In the course of adjudicating specific cases, this Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization,[40] may not discriminate among persons on the basis of their religious beliefs and practices,[41]

---

[39] See also M. Borden, Jews, Turks, and Infidels (1984) (charting the history of discrimination against non-Christian citizens of the United States in the 18th and 19th centuries); Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 919–920 (1986) (Laycock) (the intolerance of late 18th-century Americans towards Catholics, Jews, Moslems, and atheists cannot be the basis of interpreting the Establishment Clause today).

[40] A State may neither allow public-school students to receive religious instruction on public-school premises, *Illinois ex rel. McCollum* v. *Board of Education of School Dist. No. 71, Champaign County*, 333 U. S. 203 (1948), nor allow religious-school students to receive state-sponsored education in their religious schools. *School District of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985). Similarly unconstitutional is state-sponsored prayer in public schools. *Abington School District* v. *Schempp*, 374 U. S. 203 (1963); *Engel* v. *Vitale*, 370 U. S. 421 (1962). And the content of a public school's curriculum may not be based on a desire to promote religious beliefs. *Edwards* v. *Aguillard*, 482 U. S. 578 (1987); *Epperson* v. *Arkansas*, 393 U. S. 97 (1968). For the same reason, posting the Ten Commandments on the wall of a public-school classroom violates the Establishment Clause. *Stone* v. *Graham*, 449 U. S. 39 (1980).

[41] A statute that conditions the holding of public office on a belief in the existence of God is unconstitutional, *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), as is one that grants a tax exemption for only religious literature, *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989), and one that grants an employee a right not to work on his Sabbath, *Estate of Thornton* v. *Caldor*,

may not delegate a governmental power to a religious institution,[42] and may not involve itself too deeply in such an institution's affairs.[43] Although "the myriad, subtle ways in which Establishment Clause values can be eroded," *Lynch* v. *Donnelly*, 465 U. S., at 694 (O'CONNOR, J., concurring), are not susceptible to a single verbal formulation, this Court has attempted to encapsulate the essential precepts of the Establishment Clause. Thus, in *Everson* v. *Board of Education of Ewing*, 330 U. S. 1 (1947), the Court gave this often-repeated summary:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*." *Id.*, at 15–16.

---

*Inc.*, 472 U. S. 703, 709–710, and n. 9 (1985) (reasoning that other employees might also have strong reasons for taking a particular day off from work each week). See also *Larson* v. *Valente*, 456 U. S. 228 (1982) (invalidating a statute that imposed registration and reporting requirements upon only those religious organizations that solicit more than 50% of their funds from nonmembers).

[42] *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982).

[43] See *Aguilar* v. *Felton*, 473 U. S. 402, 409 (1985); *Wolman* v. *Walter*, 433 U. S. 229, 254 (1977); *Meek* v. *Pittenger*, 421 U. S. 349, 370 (1975); *Lemon* v. *Kurtzman*, 403 U. S. 602, 619–622 (1971).

In *Lemon* v. *Kurtzman, supra*, the Court sought to refine these principles by focusing on three "tests" for determining whether a government practice violates the Establishment Clause. Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion. 403 U. S., at 612–613. This trilogy of tests has been applied regularly in the Court's later Establishment Clause cases.[44]

Our subsequent decisions further have refined the definition of governmental action that unconstitutionally advances religion. In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of "endorsing" religion, a concern that has long had a place in our Establishment Clause jurisprudence. See *Engel* v. *Vitale*, 370 U. S. 421, 436 (1962). Thus, in *Wallace* v. *Jaffree*, 472 U. S., at 60, the Court held unconstitutional Alabama's moment-of-silence statute because it was "enacted . . . for the sole purpose of expressing the State's endorsement of prayer activities." The Court similarly invalidated Louisiana's "Creationism Act" because it "endorses religion" in its purpose. *Edwards* v. *Aguillard*, 482 U. S. 578, 593 (1987). And the educational

---

[44] See, *e. g.*, *Bowen* v. *Kendrick*, 487 U. S. 589, 602 (1988); *Edwards* v. *Aguillard*, 482 U. S., at 583; *Witters* v. *Washington Dept. of Services for Blind*, 474 U. S. 481, 485 (1986); *Aguilar* v. *Felton*, 473 U. S., at 410; *School Dist. of Grand Rapids* v. *Ball*, 473 U. S., at 382–383; *Estate of Thornton* v. *Caldor, Inc.*, 472 U. S., at 708; *Wallace* v. *Jaffree*, 472 U. S. 38, 55–56 (1985); *Larkin* v. *Grendel's Den, Inc.*, 459 U. S., at 123; *Stone* v. *Graham*, 449 U. S., at 40; *Committee for Public Education and Religious Liberty* v. *Regan*, 444 U. S. 646, 653 (1980); *Meek* v. *Pittenger, supra*; *Sloan* v. *Lemon*, 413 U. S. 825 (1973); *Committee for Public Education and Religious Liberty* v. *Nyquist*, 413 U. S. 756, 772–773 (1973); *Hunt* v. *McNair*, 413 U. S. 734, 741 (1973); *Levitt* v. *Committee for Public Education and Religious Liberty*, 413 U. S. 472, 481–482 (1973).

program in *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 389–392 (1985), was held to violate the Establishment Clause because of its "endorsement" effect. See also *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 17 (1989) (plurality opinion) (tax exemption limited to religious periodicals "effectively endorses religious belief").

Of course, the word "endorsement" is not self-defining. Rather, it derives its meaning from other words that this Court has found useful over the years in interpreting the Establishment Clause. Thus, it has been noted that the prohibition against governmental endorsement of religion "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred.*" *Wallace* v. *Jaffree*, 472 U. S., at 70 (O'CONNOR, J., concurring in judgment) (emphasis added). Accord, *Texas Monthly, Inc.* v. *Bullock*, 489 U. S., at 27, 28 (separate opinion concurring in judgment) (reaffirming that "government may not favor religious belief over disbelief" or adopt a "preference for the dissemination of religious ideas"); *Edwards* v. *Aguillard*, 482 U. S., at 593 ("preference" for particular religious beliefs constitutes an endorsement of religion); *Abington School District* v. *Schempp*, 374 U. S. 203, 305 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government . . . effect no favoritism among sects or between religion and nonreligion"). Moreover, the term "endorsement" is closely linked to the term "promotion," *Lynch* v. *Donnelly*, 465 U. S., at 691 (O'CONNOR, J., concurring), and this Court long since has held that government "may not . . . promote one religion or religious theory against another or even against the militant opposite," *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). See also *Wallace* v. *Jaffree*, 472 U. S., at 59–60 (using the concepts of endorsement, promotion, and favoritism interchangeably).

Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The

Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community." *Lynch* v. *Donnelly*, 465 U. S., at 687 (O'CONNOR, J., concurring).

## B

We have had occasion in the past to apply Establishment Clause principles to the government's display of objects with religious significance. In *Stone* v. *Graham*, 449 U. S. 39 (1980), we held that the display of a copy of the Ten Commandments on the walls of public classrooms violates the Establishment Clause. Closer to the facts of this litigation is *Lynch* v. *Donnelly, supra,* in which we considered whether the city of Pawtucket, R. I., had violated the Establishment Clause by including a crèche in its annual Christmas display, located in a private park within the downtown shopping district. By a 5-to-4 decision in that difficult case, the Court upheld inclusion of the crèche in the Pawtucket display, holding, *inter alia,* that the inclusion of the crèche did not have the impermissible effect of advancing or promoting religion.[45]

The rationale of the majority opinion in *Lynch* is none too clear: the opinion contains two strands, neither of which provides guidance for decision in subsequent cases. First, the opinion states that the inclusion of the crèche in the display was "no more an advancement or endorsement of religion" than other "endorsements" this Court has approved in the past, 465 U. S., at 683—but the opinion offers no discernible measure for distinguishing between permissible and impermissible endorsements. Second, the opinion observes that any benefit the government's display of the crèche gave to religion was no more than "indirect, remote, and incidental," *ibid.*—without saying how or why.

---

[45] There is no need here to review the applications in *Lynch* of the "purpose" and "entanglement" elements of the *Lemon* inquiry, since in the present action the Court of Appeals did not consider these issues.

Although JUSTICE O'CONNOR joined the majority opinion in *Lynch*, she wrote a concurrence that differs in significant respects from the majority opinion. The main difference is that the concurrence provides a sound analytical framework for evaluating governmental use of religious symbols.

First and foremost, the concurrence squarely rejects any notion that this Court will tolerate some government endorsement of religion. Rather, the concurrence recognizes any endorsement of religion as "invalid," *id.*, at 690, because it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community," *id.*, at 688.

Second, the concurrence articulates a method for determining whether the government's use of an object with religious meaning has the effect of endorsing religion. The effect of the display depends upon the message that the government's practice communicates: the question is "what viewers may fairly understand to be the purpose of the display." *Id.*, at 692. That inquiry, of necessity, turns upon the context in which the contested object appears: "[A] typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Ibid.* The concurrence thus emphasizes that the constitutionality of the crèche in that case depended upon its "particular physical setting," *ibid.*, and further observes: "Every government practice must be judged in its unique circumstances to determine whether it [endorses] religion," *id.*, at 694.[46]

---

[46] The difference in approach between the *Lynch* majority and the concurrence is especially evident in each opinion's treatment of *Marsh* v. *Chambers*, 463 U. S. 783 (1983). In that case, the Court sustained the practice of legislative prayer based on its unique history: Congress authorized the payment of legislative chaplains during the same week that it reached final agreement on the language of the Bill of Rights. *Id.*, at 788. The *Lynch* majority employed *Marsh* comparatively: to forbid the use of the crèche, "while the Congress and legislatures open sessions with pray-

The concurrence applied this mode of analysis to the Pawtucket crèche, seen in the context of that city's holiday celebration as a whole. In addition to the crèche, the city's display contained: a Santa Claus house with a live Santa distributing candy; reindeer pulling Santa's sleigh; a live 40-foot Christmas tree strung with lights; statues of carolers in old-fashioned dress; candy-striped poles; a "talking" wishing well; a large banner proclaiming "SEASONS GREETINGS"; a miniature "village" with several houses and a church; and various "cut-out" figures, including those of a clown, a dancing elephant, a robot, and a teddy bear. See 525 F. Supp. 1150, 1155 (RI 1981). The concurrence concluded that both because the crèche is "a traditional symbol" of Christmas, a holiday with strong secular elements, and because the crèche was "displayed along with purely secular symbols," the crèche's setting "changes what viewers may fairly understand to be the purpose of the display" and "negates any message of endorsement" of "the Christian beliefs represented by the crèche." 465 U. S., at 692.

The four *Lynch* dissenters agreed with the concurrence that the controlling question was "whether Pawtucket ha[d] run afoul of the Establishment Clause by endorsing religion through its display of the crèche." *Id.*, at 698, n. 3 (BRENNAN, J., dissenting). The dissenters also agreed with the

---

ers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings." *Lynch*, 465 U. S., at 686.

The concurrence, in contrast, harmonized the result in *Marsh* with the endorsement principle in a rigorous way, explaining that legislative prayer (like the invocation that commences each session of this Court) is a form of acknowledgment of religion that "serve[s], in the only wa[y] reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." 465 U. S., at 693. The function and history of this form of ceremonial deism suggest that "those practices are not understood as conveying government approval of particular religious beliefs." *Ibid.;* see also *id.*, at 717 (BRENNAN, J., dissenting).

general proposition that the context in which the government uses a religious symbol is relevant for determining the answer to that question. *Id.*, at 705–706. They simply reached a different answer: the dissenters concluded that the other elements of the Pawtucket display did not negate the endorsement of Christian faith caused by the presence of the crèche. They viewed the inclusion of the crèche in the city's overall display as placing "the government's imprimatur of approval on the particular religious beliefs exemplified by the crèche." *Id.*, at 701. Thus, they stated: "The effect on minority religious groups, as well as on those who may reject all religion, is to convey the message that their views are not similarly worthy of public recognition nor entitled to public support." *Ibid.*

Thus, despite divergence at the bottom line, the five Justices in concurrence and dissent in *Lynch* agreed upon the relevant constitutional principles: the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context. These general principles are sound, and have been adopted by the Court in subsequent cases. Since *Lynch*, the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Grand Rapids*, 473 U. S., at 390. Accordingly, our present task is to determine whether the display of the crèche and the menorah, in their respective "particular physical settings," has the effect of endorsing or disapproving religious beliefs.[47]

---

[47] The county and the city argue that their use of religious symbols does not violate the Establishment Clause unless they are shown to be "coercive." Reply Brief for Petitioners County of Allegheny et al. 1–6; Tr. of Oral Arg. 9, 11. They recognize that this Court repeatedly has stated that

## IV

We turn first to the county's crèche display. There is no doubt, of course, that the crèche itself is capable of communicating a religious message. See *Lynch*, 465 U. S., at 685 (majority opinion); *id.*, at 692 (O'CONNOR, J., concurring); *id.*, at 701 (BRENNAN, J., dissenting); *id.*, at 727 (BLACKMUN, J., dissenting). Indeed, the crèche in this lawsuit uses words, as well as the picture of the Nativity scene, to make its religious meaning unmistakably clear. "Glory to God in the Highest!" says the angel in the crèche—Glory to God because of the birth of Jesus. This praise to God in Christian terms is indisputably religious—indeed sectarian—just as it is when said in the Gospel or in a church service.

Under the Court's holding in *Lynch*, the effect of a crèche display turns on its setting. Here, unlike in *Lynch*, nothing in the context of the display detracts from the crèche's religious message. The *Lynch* display comprised a series of figures and objects, each group of which had its own focal point. Santa's house and his reindeer were objects of attention separate from the crèche, and had their specific visual story to tell. Similarly, whatever a "talking" wishing well may be, it obviously was a center of attention separate from the crèche. Here, in contrast, the crèche stands alone: it is the single element of the display on the Grand Staircase.[48]

---

"proof of coercion" is "not a necessary element of any claim under the Establishment Clause." *Committee for Public Education and Religious Liberty* v. *Nyquist*, 413 U. S., at 786; see also *Abington School District* v. *Schempp*, 374 U. S., at 222–223; *Engel* v. *Vitale*, 370 U. S., at 430. But they suggest that the Court reconsider this principle. Reply Brief for Petitioners Allegheny County et al. 3; cf. *American Jewish Congress* v. *Chicago*, 827 F. 2d 120, 137 (CA7 1987) (dissenting opinion); McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L. Rev. 933 (1986). The Court declines to do so, and proceeds to apply the controlling endorsement inquiry, which does not require an independent showing of coercion.

[48] The presence of Santas or other Christmas decorations elsewhere in the county courthouse, and of the nearby gallery forum, fail to negate the

The floral decoration surrounding the crèche cannot be viewed as somehow equivalent to the secular symbols in the overall *Lynch* display. The floral frame, like all good frames, serves only to draw one's attention to the message inside the frame. The floral decoration surrounding the crèche contributes to, rather than detracts from, the endorsement of religion conveyed by the crèche. It is as if the county had allowed the Holy Name Society to display a cross on the Grand Staircase at Easter, and the county had surrounded the cross with Easter lilies. The county could not say that surrounding the cross with traditional flowers of the season would negate the endorsement of Christianity conveyed by the cross on the Grand Staircase. Its contention that the traditional Christmas greens negate the endorsement effect of the crèche fares no better.

Nor does the fact that the crèche was the setting for the county's annual Christmas-carol program diminish its religious meaning. First, the carol program in 1986 lasted only from December 3 to December 23 and occupied at most one hour a day. JEV 28. The effect of the crèche on those who viewed it when the choirs were not singing—the vast majority of the time—cannot be negated by the presence of the choir program. Second, because some of the carols performed at the site of the crèche were religious in nature,[49] those carols were more likely to augment the religious quality of the scene than to secularize it.

Furthermore, the crèche sits on the Grand Staircase, the "main" and "most beautiful part" of the building that is the seat of county government. App. 157. No viewer could reasonably think that it occupies this location without the

---

endorsement effect of the crèche. The record demonstrates clearly that the crèche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building. Tr. of Oral Arg. 7.

[49] See App. 169 (religious as well as nonreligious carols were sung at the program).

support and approval of the government.[50]  Thus, by permitting the "display of the crèche in this particular physical setting," *Lynch*, 465 U. S., at 692 (O'CONNOR, J., concurring), the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message.

The fact that the crèche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion.  On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own.  But the Establishment Clause does not limit only the religious content of the government's own communications.  It also prohibits the government's support and promotion of religious communications by religious organizations.  See, *e. g., Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989) (government support of the distribution of religious messages by religious organizations violates the Establishment Clause).  Indeed, the very concept of "endorsement" con-

---

[50] The Grand Staircase does not appear to be the kind of location in which all were free to place their displays for weeks at a time, so that the presence of the crèche in that location for over six weeks would then not serve to associate the government with the crèche.  Even if the Grand Staircase occasionally was used for displays other than the crèche (for example, a display of flags commemorating the 25th anniversary of Israel's independence, *id.*, at 176), it remains true that any display located there fairly may be understood to express views that receive the support and endorsement of the government.  In any event, the county's own press releases made clear to the public that the county associated itself with the crèche.  JEV 28 (flier identifying the choral program as county sponsored); *id.*, at 30; App. 174 (linking the crèche to the choral program).  Moreover, the county created a visual link between itself and the crèche: it placed next to official county signs two small evergreens identical to those in the crèche display.  In this respect, the crèche here does not raise the kind of "public forum" issue, cf. *Widmar* v. *Vincent*, 454 U. S. 263 (1981), presented by the crèche in *McCreary* v. *Stone*, 739 F. 2d 716 (CA2 1984), aff'd by an equally divided Court *sub nom. Board of Trustees of Scarsdale* v. *McCreary*, 471 U. S. 83 (1985) (private crèche in public park).

veys the sense of promoting someone else's message. Thus, by prohibiting government endorsement of religion, the Establishment Clause prohibits precisely what occurred here: the government's lending its support to the communication of a religious organization's religious message.

Finally, the county argues that it is sufficient to validate the display of the crèche on the Grand Staircase that the display celebrates Christmas, and Christmas is a national holiday. This argument·obviously proves too much. It would allow the celebration of the Eucharist inside a courthouse on Christmas Eve. While the county may have doubts about the constitutional status of celebrating the Eucharist inside the courthouse under the government's auspices, see Tr. of Oral Arg. 8–9, this Court does not. The government may acknowledge Christmas as a cultural phenomenon, but under the First Amendment it may not observe it as a Christian holy day by suggesting that people praise God for the birth of Jesus.[51]

In sum, *Lynch* teaches that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine. Here, Allegheny County has transgressed this line. It has chosen to celebrate Christmas in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ. Under *Lynch*, and the rest of our cases, nothing more is required to

---

[51] Nor can the display of the crèche be justified as an "accommodation" of religion. See *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987). Government efforts to accommodate religion are permissible when they remove burdens on the free exercise of religion. *Id.*, at 348 (O'CONNOR, J., concurring in judgment). The display of a crèche in a courthouse does not remove any burden on the free exercise of Christianity. Christians remain free to display crèches in their homes and churches. To be sure, prohibiting the display of a crèche in the courthouse deprives Christians of the satisfaction of seeing the government adopt their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes.

demonstrate a violation of the Establishment Clause. The display of the crèche in this context, therefore, must be permanently enjoined.

## V

JUSTICE KENNEDY and the three Justices who join him would find the display of the crèche consistent with the Establishment Clause. He argues that this conclusion necessarily follows from the Court's decision in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), which sustained the constitutionality of legislative prayer. *Post*, at 665. He also asserts that the crèche, even in this setting, poses "no realistic risk" of "represent[ing] an effort to proselytize," *post*, at 664, having repudiated the Court's endorsement inquiry in favor of a "proselytization" approach. The Court's analysis of the crèche, he contends, "reflects an unjustified hostility toward religion." *Post*, at 655.

JUSTICE KENNEDY's reasons for permitting the crèche on the Grand Staircase and his condemnation of the Court's reasons for deciding otherwise are so far reaching in their implications that they require a response in some depth.

### A

In *Marsh*, the Court relied specifically on the fact that Congress authorized legislative prayer at the same time that it produced the Bill of Rights. See n. 46, *supra*. JUSTICE KENNEDY, however, argues that *Marsh* legitimates all "practices with no greater potential for an establishment of religion" than those "accepted traditions dating back to the Founding." *Post*, at 670, 669. Otherwise, the Justice asserts, such practices as our national motto ("In God We Trust") and our Pledge of Allegiance (with the phrase "under God," added in 1954, Pub. L. 396, 68 Stat. 249) are in danger of invalidity.

Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an en-

dorsement of religious belief. *Lynch*, 465 U. S., at 693 (O'CONNOR, J., concurring); *id.*, at 716–717 (BRENNAN, J., dissenting). We need not return to the subject of "ceremonial deism," see n. 46, *supra*, because there is an obvious distinction between crèche displays and references to God in the motto and the pledge. However history may affect the constitutionality of nonsectarian references to religion by the government,[52] history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.

Indeed, in *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer, 463 U. S., at 791, can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. *Id.*, at 794–795. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." *Id.*, at 793, n. 14. Thus, *Marsh* plainly does not stand for the sweeping proposition JUSTICE KENNEDY apparently would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today. Nor can *Marsh*, given its facts and its reasoning, compel the conclusion that the display of the crèche involved in this lawsuit is constitutional. Although JUSTICE KENNEDY says that he "cannot comprehend" how the crèche display could be invalid after *Marsh*, *post*, at 665, surely he is able to distinguish between a specifically Christian symbol, like a crèche, and more general religious references, like the legislative prayers in *Marsh*.

---

[52] It is worth noting that just because *Marsh* sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. See *post*, at 672–673. Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct. But, as this practice is not before us, we express no judgment about its constitutionality.

JUSTICE KENNEDY's reading of *Marsh* would gut the core of the Establishment Clause, as this Court understands it. The history of this Nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically. See M. Borden, Jews, Turks, and Infidels (1984).[53] Some of these examples date back to the Founding of the Republic,[54] but this heritage of official discrimination

---

[53] Among the stories this scholar recounts is one that is especially apt in light of JUSTICE KENNEDY's citation of Thanksgiving Proclamations, *post*, at 671:

"When James H. Hammond, governor of South Carolina, announced a day of 'Thanksgiving, Humiliation, and Prayer' in 1844, he . . . exhorted 'our citizens of all denominations to assemble at their respective places of worship, to offer up their devotions to God their Creator, and his Son Jesus Christ, the Redeemer of the world.' The Jews of Charleston protested, charging Hammond with 'such obvious *discrimination and preference* in the tenor of your proclamation, as amounted to an utter exclusion of a portion of the people of South Carolina.' Hammond responded that 'I have always thought it a settled matter that I lived in a Christian land! And that I was the temporary chief magistrate of a Christian people. That in such a country and among such a people I should be, publicly, called to an account, reprimanded and required to make amends for acknowledging Jesus Christ as the Redeemer of the world, I would not have believed possible, if it had not come to pass' (*The Occident*, January 1845)." Borden 142, n. 2 (emphasis in Borden).

Thus, not all Thanksgiving Proclamations fit the nonsectarian or deist mold as did those examples quoted by JUSTICE KENNEDY. Moreover, the Jews of Charleston succinctly captured the precise evil caused by such sectarian proclamations as Governor Hammond's: they demonstrate an official *preference* for Christianity and a corresponding official *discrimination* against all non-Christians, amounting to an exclusion of a portion of the political community. It is against this very evil that the Establishment Clause, in part, is directed. Indeed, the Jews of Charleston could not better have formulated the essential concepts of the endorsement inquiry.

[54] In 1776, for instance, Maryland adopted a "Declaration of Rights" that allowed its legislature to impose a tax "for the support of the Christian religion" and a requirement that all state officials declare "a belief in the Christian religion." 1 A. Stokes, Church and State in the United States 865–866 (1950). Efforts made in 1797 to remove these discriminations against non-Christians were unsuccessful. *Id.*, at 867. See also *id.*, at 513 (quot-

against non-Christians has no place in the jurisprudence of the Establishment Clause. Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion, see, *e. g.*, *Texas Monthly, Inc.* v. *Bullock,* 489 U. S. 1 (1989)), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente,* 456 U. S. 228, 244 (1982). There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command. Cf. Laycock, *supra,* n. 39, at 923.[55]

## B

Although JUSTICE KENNEDY's misreading of *Marsh* is predicated on a failure to recognize the bedrock Establishment Clause principle that, regardless of history, government may not demonstrate a preference for a particular faith, even he is forced to acknowledge that some instances of such favoritism are constitutionally intolerable. *Post,* at 664–665, n. 3. He concedes also that the term "endorsement" long has been another way of defining a forbidden "preference" for

ing the explicitly Christian proclamation of President John Adams, who urged all Americans to seek God's grace "through the Redeemer of the world" and "by His Holy Spirit").

[55] JUSTICE KENNEDY evidently believes that contemporary references to exclusively Christian creeds (like the Trinity or the divinity of Jesus) in official acts or proclamations is justified by the religious sentiments of those responsible for the adoption of the First Amendment. See 2 J. Story, Commentaries on the Constitution of the United States § 1874, p. 663 (1858) (at the time of the First Amendment's adoption, "the general, if not the universal sentiment in America was, that Christianity ought to receive encouragement from the state"). This Court, however, squarely has rejected the proposition that the Establishment Clause is to be interpreted in light of any favoritism for Christianity that may have existed among the Founders of the Republic. *Wallace* v. *Jaffree,* 472 U. S., at 52.

a particular sect, *post*, at 668–669, but he would repudiate the Court's endorsement inquiry as a "jurisprudence of minutiae," *post*, at 674, because it examines the particular contexts in which the government employs religious symbols.

This label, of course, could be tagged on many areas of constitutional adjudication. For example, in determining whether the Fourth Amendment requires a warrant and probable cause before the government may conduct a particular search or seizure, "we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements *in the particular context*," *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 619 (1989) (emphasis added), an inquiry that "'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself,'" *ibid.*, quoting *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 537 (1985); see also *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 666 (1989) (repeating the principle that the applicability of the warrant requirement turns on "the particular context" of the search at issue). It is perhaps unfortunate, but nonetheless inevitable, that the broad language of many clauses within the Bill of Rights must be translated into adjudicatory principles that realize their full meaning only after their application to a series of concrete cases.

Indeed, not even under JUSTICE KENNEDY's preferred approach can the Establishment Clause be transformed into an exception to this rule. The Justice would substitute the term "proselytization" for "endorsement," *post*, at 659–660, 661, 664, but his "proselytization" test suffers from the same "defect," if one must call it that, of requiring close factual analysis. JUSTICE KENNEDY has no doubt, "for example, that the [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall . . . because such an obtrusive year-round religious dis-

play would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion." *Post*, at 661. He also suggests that a city would demonstrate an unconstitutional preference for Christianity if it displayed a Christian symbol during every major Christian holiday but did not display the religious symbols of other faiths during other religious holidays. *Post*, at 664–665, n. 3. But, for JUSTICE KENNEDY, would it be enough of a preference for Christianity if that city each year displayed a crèche for 40 days during the Christmas season and a cross for 40 days during Lent (and never the symbols of other religions)? If so, then what if there were no cross but the 40-day crèche display contained a sign exhorting the city's citizens "to offer up their devotions to God their Creator, and his Son Jesus Christ, the Redeemer of the world"? See n. 53, *supra.*

The point of these rhetorical questions is obvious. In order to define precisely what government could and could not do under JUSTICE KENNEDY's "proselytization" test, the Court would have to decide a series of cases with particular fact patterns that fall along the spectrum of government references to religion (from the permanent display of a cross atop city hall to a passing reference to divine Providence in an official address). If one wished to be "uncharitable" to JUSTICE KENNEDY, see *post*, at 675, one could say that his methodology requires counting the number of days during which the government displays Christian symbols and subtracting from this the number of days during which non-Christian symbols are displayed, divided by the number of different non-Christian religions represented in these displays, and then somehow factoring into this equation the prominence of the display's location and the degree to which each symbol possesses an inherently proselytizing quality. JUSTICE KENNEDY, of course, could defend his position by pointing to the inevitably fact-specific nature of the question whether a particular governmental practice signals the government's

unconstitutional preference for a specific religious faith.  But because JUSTICE KENNEDY's formulation of this essential Establishment Clause inquiry is no less fact intensive than the "endorsement" formulation adopted by the Court, JUSTICE KENNEDY should be wary of accusing the Court's formulation as "using little more than intuition and a tape measure," *post*, at 675, lest he find his own formulation convicted on an identical charge.

Indeed, perhaps the only real distinction between JUSTICE KENNEDY's "proselytization" test and the Court's "endorsement" inquiry is a burden of "unmistakable" clarity that JUSTICE KENNEDY apparently would require of government favoritism for specific sects in order to hold the favoritism in violation of the Establishment Clause.  *Post*, at 664–665, n. 3.  The question whether a particular practice "would place the government's weight behind an obvious effort to proselytize for a particular religion," *post*, at 661, is much the same as whether the practice demonstrates the government's support, promotion, or "endorsement" of the particular creed of a particular sect—except to the extent that it requires an "obvious" allegiance between the government and the sect.[56]

Our cases, however, impose no such burden on demonstrating that the government has favored a particular sect or creed.  On the contrary, we have expressly required "strict

---

[56] In describing what would violate his "proselytization" test, JUSTICE KENNEDY uses the adjectives "permanent," "year-round," and "continual," *post*, at 661, 664–665, n. 3, as if to suggest that temporary acts of favoritism for a particular sect do not violate the Establishment Clause.  Presumably, however, JUSTICE KENNEDY does not really intend these adjectives to define the limits of his principle, since it is obvious that the government's efforts to proselytize may be of short duration, as Governor Hammond's Thanksgiving Proclamation illustrates.  See n. 53, *supra*.  In any event, the Court repudiated any notion that preferences for particular religious beliefs are permissible unless permanent when, in *Bowen* v. *Kendrick*, 487 U. S., at 620, it ordered an inquiry into the "specific instances of impermissible behavior" that may have occurred in the administration of a statutory program.

scrutiny" of practices suggesting "a denominational prefer-
ence," *Larson* v. *Valente*, 456 U. S., at 246, in keeping with
"'the unwavering vigilance that the Constitution requires'"
against any violation of the Establishment Clause. *Bowen*
v. *Kendrick*, 487 U. S. 589, 623 (1988) (O'CONNOR, J., con-
curring), quoting *id.*, at 648 (dissenting opinion); see also
*Lynch*, 465 U. S., at 694 (O'CONNOR, J., concurring) ("[T]he
myriad, subtle ways in which Establishment Clause values
can be eroded" necessitates "careful judicial scrutiny" of
"[g]overnment practices that purport to celebrate or ac-
knowledge events with religious significance"). Thus, when
all is said and done, JUSTICE KENNEDY's effort to abandon
the "endorsement" inquiry in favor of his "proselytization"
test seems nothing more than an attempt to lower consider-
ably the level of scrutiny in Establishment Clause cases.
We choose, however, to adhere to the vigilance the Court has
managed to maintain thus far, and to the endorsement in-
quiry that reflects our vigilance.[57]

---

[57] It is not clear, moreover, why JUSTICE KENNEDY thinks the display of
the crèche in this lawsuit is permissible even under his lax "proselytiza-
tion" test. Although early on in his opinion he finds "no realistic risk that
the crèche . . . represent[s] an effort to proselytize," *post*, at 664, at the
end he concludes: "[T]he eager proselytizer may seek to use [public crèche
displays] for his own ends. The urge to use them to teach or to taunt is
*always present.*" *Post*, at 678 (emphasis added). Whatever the cause of
this inconsistency, it should be obvious to all that the crèche on the Grand
Staircase communicates the message that Jesus is the Messiah and to be
worshipped as such, an inherently prosyletizing message if ever there was
one. In fact, the angel in the crèche display represents, according to
Christian tradition, one of the original "proselytizers" of the Christian
faith: the angel who appeared to the shepherds to tell them of the birth of
Christ. Thus, it would seem that JUSTICE KENNEDY should find this dis-
play unconstitutional according to a consistent application of his principle
that government may not place its weight behind obvious efforts to pros-
elytize Christian creeds specifically.

Contrary to JUSTICE KENNEDY's assertion, the Court's decision in
*Lynch* does not foreclose this conclusion. *Lynch* certainly is *not* "dispos-
itive of [a] claim," *post*, at 665, regarding the government's display of a
crèche bearing an explicitly proselytizing sign (like "Let's all rejoice in

## C

Although JUSTICE KENNEDY repeatedly accuses the Court of harboring a "latent hostility" or "callous indifference" toward religion, *post*, at 657, 664, nothing could be further from the truth, and the accusations could be said to be as offensive as they are absurd. JUSTICE KENNEDY apparently has misperceived a respect for religious pluralism, a respect commanded by the Constitution, as hostility or indifference to religion. No misperception could be more antithetical to the values embodied in the Establishment Clause.

JUSTICE KENNEDY's accusations are shot from a weapon triggered by the following proposition: if government may celebrate the secular aspects of Christmas, then it must be allowed to celebrate the religious aspects as well because, otherwise, the government would be discriminating against citizens who celebrate Christmas as a religious, and not just a secular, holiday. *Post*, at 663–664. This proposition, however, is flawed at its foundation. The government does not discriminate against any citizen on the basis of the citizen's religious faith if the government is secular in its functions and operations. On the contrary, the Constitution mandates that the government remain secular, rather than affiliate itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths.

A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither atheism nor religion as its official creed. JUSTICE KENNEDY thus has it exactly backwards when he says that enforcing the Constitution's requirement that govern-

---

Jesus Christ, the Redeemer of the world," cf. n. 53, *supra*). As much as JUSTICE KENNEDY tries, see *post*, at 665–666, there is no hiding behind the fiction that *Lynch* decides the constitutionality of every possible government crèche display. Once stripped of this fiction, JUSTICE KENNEDY's opinion transparently lacks a principled basis, consistent with our precedents, for asserting that the crèche display here must be held constitutional.

ment remain secular is a prescription of orthodoxy. *Post*, at 678. It follows directly from the Constitution's proscription against government affiliation with religious beliefs or institutions that there is no orthodoxy on religious matters in the secular state. Although JUSTICE KENNEDY accuses the Court of "an Orwellian rewriting of history," *ibid.*, perhaps it is JUSTICE KENNEDY himself who has slipped into a form of Orwellian newspeak when he equates the constitutional command of secular government with a prescribed orthodoxy.

To be sure, in a pluralistic society there may be some would-be theocrats, who wish that their religion were an established creed, and some of them perhaps may be even audacious enough to claim that the lack of established religion discriminates against their preferences. But this claim gets no relief, for it contradicts the fundamental premise of the Establishment Clause itself. The antidiscrimination principle inherent in the Establishment Clause necessarily means that would-be discriminators on the basis of religion cannot prevail.

For this reason, the claim that prohibiting government from celebrating Christmas as a religious holiday discriminates against Christians in favor of nonadherents must fail. Celebrating Christmas as a religious, as opposed to a secular, holiday, necessarily entails professing, proclaiming, or believing that Jesus of Nazareth, born in a manger in Bethlehem, is the Christ, the Messiah. If the government celebrates Christmas as a religious holiday (for example, by issuing an official proclamation saying: "We rejoice in the glory of Christ's birth!"), it means that the government really is declaring Jesus to be the Messiah, a specifically Christian belief. In contrast, confining the government's own celebration of Christmas to the holiday's secular aspects does *not* favor the religious beliefs of non-Christians over those of Christians. Rather, it simply permits the government to acknowledge the holiday without expressing an allegiance to

Christian beliefs, an allegiance that would truly favor Christians over non-Christians. To be sure, some Christians may wish to see the government proclaim its allegiance to Christianity in a religious celebration of Christmas, but the Constitution does not permit the gratification of that desire, which would contradict the "'the logic of secular liberty'" it is the purpose of the Establishment Clause to protect. See *Larson* v. *Valente*, 456 U. S., at 244, quoting B. Bailyn, The Ideological Origins of the American Revolution 265 (1967).

Of course, not all religious celebrations of Christmas located on government property violate the Establishment Clause. It obviously is not unconstitutional, for example, for a group of parishioners from a local church to go caroling through a city park on any Sunday in Advent or for a Christian club at a public university to sing carols during their Christmas meeting. Cf. *Widmar* v. *Vincent*, 454 U. S. 263 (1981).[58] The reason is that activities of this nature do not demonstrate the government's allegiance to, or endorsement of, the Christian faith.

Equally obvious, however, is the proposition that not all proclamations of Christian faith located on government property are permitted by the Establishment Clause just because they occur during the Christmas holiday season, as the example of a Mass in the courthouse surely illustrates. And once the judgment has been made that a particular proclamation of Christian belief, when disseminated from a particular location on government property, has the effect of demonstrating the government's endorsement of Christian faith, then it necessarily follows that the practice must be enjoined to protect the constitutional rights of those citizens who follow some creed other than Christianity. It is thus incontrovertible that the Court's decision today, premised on the determination that the crèche display on the Grand Staircase demon-

---

[58] Thus, JUSTICE KENNEDY is incorrect when he says, *post*, at 674, n. 10, that the Court fails to explain why today's decision does not require the elimination of all religious Christmas music from public property.

strates the county's endorsement of Christianity, does not represent a hostility or indifference to religion but, instead, the respect for religious diversity that the Constitution requires.[59]

## VI

The display of the Chanukah menorah in front of the City-County Building may well present a closer constitutional question. The menorah, one must recognize, is a religious symbol: it serves to commemorate the miracle of the oil as described in the Talmud. But the menorah's message is not exclusively religious. The menorah is the primary visual

---

[59] In his attempt to legitimate the display of the crèche on the Grand Staircase, JUSTICE KENNEDY repeatedly characterizes it as an "accommodation" of religion. See, e. g., post, at 663, 664. But an accommodation of religion, in order to be permitted under the Establishment Clause, must lift "an identifiable burden *on the exercise of religion.*" *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S., at 348 (O'CONNOR, J., concurring in judgment) (emphasis in original); see also McConnell, Accommodation of Religion, 1985 S. Ct. Rev. 1, 3–4 (defining "accommodation" as government action as "specifically for the purpose of facilitating the free exercise of religion," usually by exempting religious practices from general regulations). Defined thus, the concept of accommodation plainly has no relevance to the display of the crèche in this lawsuit. See n. 51, *supra.*

One may agree with JUSTICE KENNEDY that the scope of accommodations permissible under the Establishment Clause is larger than the scope of accommodations mandated by the Free Exercise Clause. See *post,* at 663, n. 2. An example prompted by the Court's decision in *Goldman* v. *Weinberger,* 475 U. S. 503 (1986), comes readily to mind: although the Free Exercise Clause does not require the Air Force to exempt yarmulkes from a no-headdress rule, it is at least plausible that the Establishment Clause permits the Air Force to promulgate a regulation exempting yarmulkes (and similar religiously motivated headcoverings) from its no-headdress rule. But a category of "permissible accommodations of religion not required by the Free Exercise Clause" aids the crèche on the Grand Staircase not at all. Prohibiting the display of a crèche at this location, it bears repeating, does not impose a burden on the practice of Christianity (except to the extent that some Christian sect seeks to be an officially approved religion), and therefore permitting the display is not an "accommodation" of religion in the conventional sense.

symbol for a holiday that, like Christmas, has both religious and secular dimensions.[60]

Moreover, the menorah here stands next to a Christmas tree and a sign saluting liberty. While no challenge has been made here to the display of the tree and the sign, their presence is obviously relevant in determining the effect of the menorah's display. The necessary result of placing a menorah next to a Christmas tree is to create an "overall holiday setting" that represents both Christmas and Chanukah—two holidays, not one. See *Lynch*, 465 U. S., at 692 (O'CONNOR, J., concurring).

The mere fact that Pittsburgh displays symbols of both Christmas and Chanukah does not end the constitutional inquiry. If the city celebrates both Christmas and Chanukah as religious holidays, then it violates the Establishment Clause.

---

[60] JUSTICE KENNEDY is clever but mistaken in asserting that the description of the menorah, *supra*, at 582–587, purports to turn the Court into a "national theology board." *Post*, at 678. Any inquiry concerning the government's use of a religious object to determine whether that use results in an unconstitutional religious preference requires a review of the factual record concerning the religious object—even if the inquiry is conducted pursuant to JUSTICE KENNEDY's "proselytization" test. Surely, JUSTICE KENNEDY cannot mean that this Court must keep itself in ignorance of the symbol's conventional use and decide the constitutional question knowing only what it knew before the case was filed. This prescription of ignorance obviously would bias this Court according to the religious and cultural backgrounds of its Members, a condition much more intolerable than any which results from the Court's efforts to become familiar with the relevant facts.

Moreover, the relevant facts concerning Chanukah and the menorah are largely to be found in the record, as indicated by the extensive citation to the Appendix, *supra*, at 582–585. In any event, Members of this Court have not hesitated in referring to secondary sources in aid of their Establishment Clause analysis, see, *e. g., Lynch*, 465 U. S., at 709–712, 721–724 (BRENNAN, J., dissenting), because the question "whether a government activity communicates an endorsement of religion" is "in large part a legal question to be answered on the basis of judicial interpretation of social facts," *id.*, at 693–694 (O'CONNOR, J., concurring).

The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone.[61]

Conversely, if the city celebrates both Christmas and Chanukah as secular holidays, then its conduct is beyond the reach of the Establishment Clause. Because government may celebrate Christmas as a secular holiday,[62] it follows that government may also acknowledge Chanukah as a secular holiday. Simply put, it would be a form of discrimination against Jews to allow Pittsburgh to celebrate Christmas as a cultural tradition while simultaneously disallowing the city's acknowledgment of Chanukah as a contemporaneous cultural tradition.[63]

---

[61] The display of a menorah next to a crèche on government property might prove to be invalid. Cf. *Greater Houston Chapter of American Civil Liberties Union* v. *Eckels*, 589 F. Supp. 222 (SD Tex. 1984), appeal dism'd, 755 F. 2d 426 (CA5), cert. denied, 474 U. S. 980 (1985) (war memorial containing crosses and a Star of David unconstitutionally favored Christianity and Judaism, discriminating against the beliefs of patriotic soldiers who were neither Christian nor Jewish).

[62] It is worth recalling here that no Member of the Court in *Lynch* suggested that government may not celebrate the secular aspects of Christmas. On the contrary, the four dissenters there stated: "If public officials . . . participate in the *secular* celebration of Christmas — by, for example, decorating public places with such secular images as wreaths, garlands, or Santa Claus figures — they move closer to the limits of their constitutional power but nevertheless remain within the boundaries set by the Establishment Clause." 465 U. S., at 710–711 (BRENNAN, J., dissenting) (emphasis in original).

[63] Thus, to take the most obvious of examples, if it were permissible for the city to display in front of the City-County Building a banner exclaiming "Merry Christmas," then it would also be permissible for the city to display in the same location a banner proclaiming "Happy Chanukah."

JUSTICE BRENNAN, however, seems to suggest that even this practice is problematic because holidays associated with other religious traditions would be excluded. See *post*, at 644. But when the government engages in the secular celebration of Christmas, without any reference to holidays celebrated by non-Christians, other traditions are excluded — and yet

Accordingly, the relevant question for Establishment Clause purposes is whether the combined display of the tree, the sign, and the menorah has the effect of endorsing both Christian and Jewish faiths, or rather simply recognizes that both Christmas and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society. Of the two interpretations of this particular display, the latter seems far more plausible and is also in line with *Lynch*.[64]

The Christmas tree, unlike the menorah, is not itself a religious symbol. Although Christmas trees once carried religious connotations, today they typify the secular celebration of Christmas. See *American Civil Liberties Union of Illinois* v. *St. Charles*, 794 F. 2d 265, 271 (CA7), cert. denied, 479 U. S. 961 (1986); L. Tribe, American Constitutional Law 1295 (2d ed. 1988) (Tribe).[65] Numerous Americans place

---

JUSTICE BRENNAN has approved the government's secular celebration of Christmas. See n. 62, *supra*.

[64] It is distinctly implausible to view the combined display of the tree, the sign, and the menorah as endorsing the Jewish faith alone. During the time of this litigation, Pittsburgh had a population of 387,000, of which approximately 45,000 were Jews. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 34 (108th ed. 1988); App. 247. When a city like Pittsburgh places a symbol of Chanukah next to a symbol of Christmas, the result may be a simultaneous endorsement of Christianity and Judaism (depending upon the circumstances of the display). But the city's addition of a visual representation of Chanukah to its pre-existing Christmas display cannot reasonably be understood as an endorsement of Jewish—yet not Christian—belief. Thus, unless the combined Christmas-Chanukah display fairly can be seen as a double endorsement of Christian and Jewish faiths, it must be viewed as celebrating both holidays without endorsing either faith.

The conclusion that Pittsburgh's combined Christmas-Chanukah display cannot be interpreted as endorsing Judaism alone does not mean, however, that it is implausible, as a general matter, for a city like Pittsburgh to endorse a minority faith. The display of a menorah alone might well have that effect.

[65] See also Barnett 141–142 (describing the Christmas tree, along with gift giving and Santa Claus, as those aspects of Christmas which have be-

Christmas trees in their homes without subscribing to Christian religious beliefs, and when the city's tree stands alone in front of the City-County Building, it is not considered an endorsement of Christian faith. Indeed, a 40-foot Christmas tree was one of the objects that validated the crèche in *Lynch*. The widely accepted view of the Christmas tree as the preeminent secular symbol of the Christmas holiday season serves to emphasize the secular component of the message communicated by other elements of an accompanying holiday display, including the Chanukah menorah.[66]

The tree, moreover, is clearly the predominant element in the city's display. The 45-foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City-County Building; the 18-foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season. In these circumstances, then, the combination of the tree and the menorah communicates, not a simultaneous endorsement of both the Christian

---

come "so intimately identified with national life" that immigrants feel the need to adopt these customs in order to be a part of American culture). Of course, the tree is capable of taking on a religious significance if it is decorated with religious symbols. Cf. Gilbert, The Season of Good Will and Inter-religious Tension, 24 Reconstructionist 13 (1958) (considering the Christmas tree, without the Star of Bethlehem, as one of "the cultural aspects of the Christmas celebration").

[66] Although the Christmas tree represents the secular celebration of Christmas, its very association with Christmas (a holiday with religious dimensions) makes it conceivable that the tree might be seen as representing Christian religion when displayed next to an object associated with Jewish religion. For this reason, I agree with JUSTICE BRENNAN and JUSTICE STEVENS that one must ask whether the tree and the menorah together endorse the *religious* beliefs of Christians and Jews. For the reasons stated in the text, however, I conclude the city's overall display does not have this impermissible effect.

and Jewish faiths, but instead, a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition.

Although the city has used a symbol with religious meaning as its representation of Chanukah, this is not a case in which the city has reasonable alternatives that are less religious in nature. It is difficult to imagine a predominantly secular symbol of Chanukah that the city could place next to its Christmas tree. An 18-foot dreidel would look out of place and might be interpreted by some as mocking the celebration of Chanukah. The absence of a more secular alternative symbol is itself part of the context in which the city's actions must be judged in determining the likely effect of its use of the menorah. Where the government's secular message can be conveyed by two symbols, only one of which carries religious meaning, an observer reasonably might infer from the fact that the government has chosen to use the religious symbol that the government means to promote religious faith. See *Abington School District* v. *Schempp*, 374 U. S., at 295 (BRENNAN, J., concurring) (Establishment Clause forbids use of religious means to serve secular ends when secular means suffice); see also Tribe 1285.[67] But where, as here, no such choice has been made, this inference of endorsement is not present.[68]

---

[67] Contrary to the assertions of JUSTICE O'CONNOR and JUSTICE KENNEDY, I have not suggested here that the government's failure to use an available secular alternative *necessarily* results in an Establishment Clause violation. Rather, it suffices to say that the availability or unavailability of secular alternatives is an obvious *factor* to be considered in deciding whether the government's use of a religious symbol amounts to an endorsement of religious faith.

[68] In *Lynch*, in contrast, there was no need for Pawtucket to include a crèche in order to convey a secular message about Christmas. See 465 U. S., at 726–727 (BLACKMUN, J., dissenting). Thus, unless the addition of the crèche to the Pawtucket display was recognized as an endorsement of Christian faith, the crèche there was "relegated to the role of a neutral

The mayor's sign further diminishes the possibility that the tree and the menorah will be interpreted as a dual endorsement of Christianity and Judaism. The sign states that during the holiday season the city salutes liberty. Moreover, the sign draws upon the theme of light, common to both Chanukah and Christmas as winter festivals, and links that theme with this Nation's legacy of freedom, which allows an American to celebrate the holiday season in whatever way he wishes, religiously or otherwise. While no sign can disclaim an overwhelming message of endorsement, see *Stone* v. *Graham*, 449 U. S., at 41, an "explanatory plaque" may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs. See *Lynch*, 465 U. S., at 707 (BRENNAN, J., dissenting). Here, the mayor's sign serves to confirm what the context already reveals: that the display of the menorah is not an endorsement of religious faith but simply a recognition of cultural diversity.

---

harbinger of the holiday season," *id.*, at 727, serving no function different from that performed by the secular symbols of Christmas. But the same cannot be said of the addition of the menorah to the Pittsburgh display. The inclusion of the menorah here broadens the Pittsburgh display to refer not only to Christmas but also to Chanukah—a different holiday belonging to a different tradition. It does not demean Jewish faith or the religious significance of the menorah to say that the menorah in *this* context represents the holiday of Chanukah as a whole (with religious and secular aspects), just as the Christmas tree in this context can be said to represent the holiday of Christmas as a whole (with *its* religious and secular aspects).

Thus, the menorah retains its religious significance even in this display, but it does not follow that the city has endorsed religious belief over nonbelief. In displaying the menorah next to the tree, the city has demonstrated no preference for the *religious* celebration of the holiday season. This conclusion, however, would be untenable had the city substituted a crèche for its Christmas tree or if the city had failed to substitute for the menorah an alternative, more secular, representation of Chanukah.

Given all these considerations, it is not "sufficiently likely" that residents of Pittsburgh will perceive the combined display of the tree, the sign, and the menorah as an "endorsement" or "disapproval . . . of their individual religious choices." *Grand Rapids*, 473 U. S., at 390. While an adjudication of the display's effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to either of these religions, *ibid.*, the constitutionality of its effect must also be judged according to the standard of a "reasonable observer," see *Witters* v. *Washington Dept. of Services for Blind*, 474 U. S. 481, 493 (1986) (O'CONNOR, J., concurring in part and concurring in judgment); see also Tribe 1296 (challenged government practices should be judged "from the perspective of a 'reasonable non-adherent'"). When measured against this standard, the menorah need not be excluded from this particular display. The Christmas tree alone in the Pittsburgh location does not endorse Christian belief; and, on the facts before us, the addition of the menorah "cannot fairly be understood to" result in the simultaneous endorsement of Christian and Jewish faiths. *Lynch*, 465 U. S., at 693 (O'CONNOR, J., concurring). On the contrary, for purposes of the Establishment Clause, the city's overall display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season.[69]

The conclusion here that, in this particular context, the menorah's display does not have an effect of endorsing reli-

---

[69] This is not to say that the combined display of a Christmas tree and a menorah is constitutional wherever it may be located on government property. For example, when located in a public school, such a display might raise additional constitutional considerations. Cf. *Edwards* v. *Aguillard*, 482 U. S., at 583–584 (Establishment Clause must be applied with special sensitivity in the public-school context).

gious faith does not foreclose the possibility that the display of the menorah might violate either the "purpose" or "entanglement" prong of the *Lemon* analysis. These issues were not addressed by the Court of Appeals and may be considered by that court on remand.[70]

## VII

*Lynch* v. *Donnelly* confirms, and in no way repudiates, the longstanding constitutional principle that government may not engage in a practice that has the effect of promoting or endorsing religious beliefs. The display of the crèche in the county courthouse has this unconstitutional effect. The display of the menorah in front of the City-County Building, however, does not have this effect, given its "particular physical setting."

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings.

*It is so ordered.*

---

[70] In addition, nothing in this opinion forecloses the possibility that on other facts a menorah display could constitute an impermissible endorsement of religion. Indeed, there is some evidence in this record that in the past Chabad lit the menorah in front of the City-County Building in a religious ceremony that included the recitation of traditional religious blessings. See App. 281. Respondents, however, did not challenge this practice, there are no factual findings on it, and the Court of Appeals did not consider it in deciding that the display of a menorah in this location necessarily endorses Judaism. See 842 F. 2d, at 662.

There is also some suggestion in the record that Chabad advocates the public display of menorahs as part of its own proselytizing mission, but again there have been no relevant factual findings that would enable this Court to conclude that Pittsburgh has endorsed Chabad's particular proselytizing message. Of course, nothing in this opinion forecloses a challenge to a menorah display based on such factual findings.

## APPENDIX A

## APPENDIX B

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN and JUSTICE STEVENS join as to Part II, concurring in part and concurring in the judgment.

I

Judicial review of government action under the Establishment Clause is a delicate task. The Court has avoided drawing lines which entirely sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens for to do so would exhibit not neutrality but hostility to religion. Instead the courts have made case-specific examinations of the challenged government action and have attempted to do so with the aid of the standards described by JUSTICE BLACKMUN in Part III–A of the Court's opinion. *Ante*, at 590–594. Unfortunately, even the development of articulable standards and guidelines has not always resulted in agreement among the Members of this Court on the results in individual cases. And so it is again today.

The constitutionality of the two displays at issue in these cases turns on how we interpret and apply the holding in *Lynch* v. *Donnelly*, 465 U. S. 668 (1984), in which we rejected an Establishment Clause challenge to the city of Pawtucket's inclusion of a crèche in its annual Christmas holiday display. The seasonal display reviewed in *Lynch* was located in a privately owned park in the heart of the shopping district. *Id.*, at 671. In addition to the crèche, the display included "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, [and] a large banner that rea[d] 'SEASONS GREETINGS.'" *Ibid.* The city owned all the components of the display. Setting up and dismantling the crèche cost the city about $20 a year, and nominal expenses were incurred in lighting the crèche.

The *Lynch* Court began its analysis by stating that Establishment Clause cases call for careful line-drawing: "[N]o fixed, *per se* rule can be framed." *Id.*, at 678. Although de-

claring that it was not willing to be confined to any single test, the Court essentially applied the *Lemon* test, asking "whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." 465 U. S., at 679 (citing *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971)). In reversing the lower court's decision, which held that inclusion of the crèche in the holiday display violated the Establishment Clause, the Court stressed that the lower court erred in "focusing almost exclusively on the crèche." 465 U. S., at 680. "In so doing, it rejected the city's claim that its reasons for including the crèche are essentially the same as its reasons for sponsoring the display as a whole." *Ibid.* When viewed in the "context of the Christmas Holiday season," the Court reasoned, there was insufficient evidence to suggest that *inclusion* of the crèche as *part* of the holiday display was an effort to advocate a particular religious message. *Ibid.* The Court concluded that Pawtucket had a secular purpose for including the crèche in its Christmas holiday display, namely, "to depict the origins of that Holiday." *Id.,* at 681.

The Court also concluded that inclusion of the crèche in the display did not have the primary effect of advancing religion. "[D]isplay of the crèche is no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as 'Christ's Mass,' or the exhibition of literally hundreds of religious paintings in governmentally supported museums." *Id.,* at 683. Finally, the Court found no excessive entanglement between religion and government. There was "no evidence of contact with church authorities concerning the content or design of the exhibit prior to or since Pawtucket's purchase of the crèche." *Id.,* at 684.

I joined the majority opinion in *Lynch* because, as I read that opinion, it was consistent with the analysis set forth in my separate concurrence, which stressed that "[e]very gov-

ernment practice must be judged in its *unique circumstances* to determine whether it constitutes an endorsement or disapproval of religion." *Id.*, at 694 (emphasis added). Indeed, by referring repeatedly to "inclusion of the crèche" in the larger holiday display, *id.*, at 671, 680–682, 686, the *Lynch* majority recognized that the crèche had to be viewed in light of the total display of which it was a part. Moreover, I joined the Court's discussion in Part II of *Lynch* concerning government acknowledgments of religion in American life because, in my view, acknowledgments such as the legislative prayers upheld in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), and the printing of "In God We Trust" on our coins serve the secular purposes of "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch*, 465 U. S., at 693 (concurring opinion). Because they serve such secular purposes and because of their "history and ubiquity," such government acknowledgments of religion are not understood as conveying an endorsement of particular religious beliefs. *Ibid.* At the same time, it is clear that "[g]overnment practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny." *Id.*, at 694.

In my concurrence in *Lynch*, I suggested a clarification of our Establishment Clause doctrine to reinforce the concept that the Establishment Clause "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." *Id.*, at 687. The government violates this prohibition if it endorses or disapproves of religion. *Id.*, at 688. "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Ibid.* Disapproval of religion conveys the opposite message. Thus, in my view, the central issue in *Lynch* was whether the city of Pawtucket had

endorsed Christianity by displaying a crèche as part of a larger exhibit of traditional secular symbols of the Christmas holiday season.

In *Lynch*, I concluded that the city's display of a crèche in its larger holiday exhibit in a private park in the commercial district had neither the purpose nor the effect of conveying a message of government endorsement of Christianity or disapproval of other religions. The purpose of including the crèche in the larger display was to celebrate the public holiday through its traditional symbols, not to promote the religious content of the crèche. *Id.*, at 691. Nor, in my view, did Pawtucket's display of the crèche along with secular symbols of the Christmas holiday objectively convey a message of endorsement of Christianity. *Id.*, at 692.

For the reasons stated in Part IV of the Court's opinion in these cases, I agree that the crèche displayed on the Grand Staircase of the Allegheny County Courthouse, the seat of county government, conveys a message to nonadherents of Christianity that they are not full members of the political community, and a corresponding message to Christians that they are favored members of the political community. In contrast to the crèche in *Lynch*, which was displayed in a private park in the city's commercial district as part of a broader display of traditional secular symbols of the holiday season, this crèche stands alone in the county courthouse. The display of religious symbols in public areas of core government buildings runs a special risk of "mak[ing] religion relevant, in reality or public perception, to status in the political community." *Lynch, supra*, at 692 (concurring opinion). See also *American Jewish Congress* v. *Chicago*, 827 F. 2d 120, 128 (CA7 1987) ("Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses

Christianity"). The Court correctly concludes that placement of the central religious symbol of the Christmas holiday season at the Allegheny County Courthouse has the unconstitutional effect of conveying a government endorsement of Christianity.

## II

In his separate opinion, JUSTICE KENNEDY asserts that the endorsement test "is flawed in its fundamentals and unworkable in practice." *Post*, at 669 (opinion concurring in judgment in part and dissenting in part). In my view, neither criticism is persuasive. As a theoretical matter, the endorsement test captures the essential command of the Establishment Clause, namely, that government must not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message "that religion or a particular religious belief is favored or preferred." *Wallace* v. *Jaffree*, 472 U. S. 38, 70 (1985) (O'CONNOR, J., concurring in judgment); *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 389 (1985). See also Beschle, The Conservative as Liberal: The Religion Clauses, Liberal Neutrality, and the Approach of Justice O'Connor, 62 Notre Dame L. Rev. 151 (1987); Note, Developments in the Law—Religion and the State, 100 Harv. L. Rev. 1606, 1647 (1987) (Developments in the Law). We live in a pluralistic society. Our citizens come from diverse religious traditions or adhere to no particular religious beliefs at all. If government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community.

An Establishment Clause standard that prohibits only "coercive" practices or overt efforts at government proselytization, *post*, at 659–662, 664–665, but fails to take account of the numerous more subtle ways that government can show favor-

itism to particular beliefs or convey a message of disapproval to others, would not, in my view, adequately protect the religious liberty or respect the religious diversity of the members of our pluralistic political community. Thus, this Court has never relied on coercion alone as the touchstone of Establishment Clause analysis. See, *e. g.*, *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 786 (1973) ("[W]hile proof of coercion might provide a basis for a claim under the Free Exercise Clause, it [is] not a necessary element of any claim under the Establishment Clause"); *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962). To require a showing of coercion, even indirect coercion, as an essential element of an Establishment Clause violation would make the Free Exercise Clause a redundancy. See *Abington School District* v. *Schempp*, 374 U. S. 203, 223 (1963) ("The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended"). See also Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 922 (1986) ("If coercion is also an element of the establishment clause, establishment adds nothing to free exercise"). Moreover, as even JUSTICE KENNEDY recognizes, any Establishment Clause test limited to "*direct* coercion" clearly would fail to account for forms of "[s]ymbolic recognition or accommodation of religious faith" that may violate the Establishment Clause. *Post*, at 661.

I continue to believe that the endorsement test asks the right question about governmental practices challenged on Establishment Clause grounds, including challenged practices involving the display of religious symbols. Moreover, commentators in the scholarly literature have found merit in the approach. See, *e. g.*, Beschle, *supra*, at 174; Comment, *Lemon* Reconstituted: Justice O'Connor's Proposed Modifications of the *Lemon* Test for Establishment Clause Violations, 1986 B. Y. U. L. Rev. 465; Marshall, "We Know It When We

See It": The Supreme Court and Establishment, 59 S. Cal. L. Rev. 495 (1986); Developments in the Law 1647. I also remain convinced that the endorsement test is capable of consistent application. Indeed, it is notable that the three Courts of Appeals that have considered challenges to the display of a crèche standing alone at city hall have each concluded, relying in part on endorsement analysis, that such a practice sends a message to nonadherents of Christianity that they are outsiders in the political community. See 842 F. 2d 655 (CA3 1988); *American Jewish Congress* v. *Chicago,* 827 F. 2d 120, 127–128 (CA7 1987); *ACLU* v. *Birmingham,* 791 F. 2d 1561, 1566–1567 (CA6), cert. denied, 479 U. S. 939 (1986). See also *Friedman* v. *Board of County Commissioners of Bernalillo County,* 781 F. 2d 777, 780–782 (CA10 1985) (en banc) (county seal including Latin cross and Spanish motto translated as "With This We Conquer," conveys a message of endorsement of Christianity), cert. denied, 476 U. S. 1169 (1986). To be sure, the endorsement test depends on a sensitivity to the unique circumstances and context of a particular challenged practice and, like any test that is sensitive to context, it may not always yield results with unanimous agreement at the margins. But that is true of many standards in constitutional law, and even the modified coercion test offered by JUSTICE KENNEDY involves judgment and hard choices at the margin. He admits as much by acknowledging that the permanent display of a Latin cross at city hall would violate the Establishment Clause, as would the display of symbols of Christian holidays alone. *Post,* at 661, 664–665, n. 3. Would the display of a Latin cross for six months have such an unconstitutional effect, or the display of the symbols of most Christian holidays and one Jewish holiday? Would the Christmastime display of a crèche inside a courtroom be "coercive" if subpoenaed witnesses had no opportunity to "turn their backs" and walk away? *Post,* at 664. Would displaying a crèche in front of a public school violate the Establishment Clause under JUSTICE KENNEDY's test?

We cannot avoid the obligation to draw lines, often close and difficult lines, in deciding Establishment Clause cases, and that is not a problem unique to the endorsement test.

JUSTICE KENNEDY submits that the endorsement test is inconsistent with our precedents and traditions because, in his words, if it were "applied without artificial exceptions for historical practice," it would invalidate many traditional practices recognizing the role of religion in our society. *Post*, at 670. This criticism shortchanges both the endorsement test itself and my explanation of the reason why certain long-standing government acknowledgments of religion do not, under that test, convey a message of endorsement. Practices such as legislative prayers or opening Court sessions with "God save the United States and this honorable Court" serve the secular purposes of "solemnizing public occasions" and "expressing confidence in the future," *Lynch*, 465 U. S., at 693 (concurring opinion). These examples of ceremonial deism do not survive Establishment Clause scrutiny simply by virtue of their historical longevity alone. Historical acceptance of a practice does not in itself validate that practice under the Establishment Clause if the practice violates the values protected by that Clause, just as historical acceptance of racial or gender based discrimination does not immunize such practices from scrutiny under the Fourteenth Amendment. As we recognized in *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 678 (1970): "[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."

Under the endorsement test, the "history and ubiquity" of a practice is relevant not because it creates an "artificial exception" from that test. On the contrary, the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion. It is the combination of the

longstanding existence of practices such as opening legislative sessions with legislative prayers or opening Court sessions with "God save the United States and this honorable Court," as well as their nonsectarian nature, that leads me to the conclusion that those particular practices, despite their religious roots, do not convey a message of endorsement of particular religious beliefs. See *Lynch, supra,* at 693 (concurring opinion); Developments in the Law 1652–1654. Similarly, the celebration of Thanksgiving as a public holiday, despite its religious origins, is now generally understood as a celebration of patriotic values rather than particular religious beliefs. The question under endorsement analysis, in short, is whether a reasonable observer would view such longstanding practices as a disapproval of his or her particular religious choices, in light of the fact that they serve a secular purpose rather than a sectarian one and have largely lost their religious significance over time. See L. Tribe, American Constitutional Law 1294–1296 (2d ed. 1988). Although the endorsement test requires careful and often difficult linedrawing and is highly context specific, no alternative test has been suggested that captures the essential mandate of the Establishment Clause as well as the endorsement test does, and it warrants continued application and refinement.

Contrary to JUSTICE KENNEDY's assertions, neither the endorsement test nor its application in these cases reflects "an unjustified hostility toward religion." *Post,* at 655. See also *post,* at 663, 667–678. Instead, the endorsement standard recognizes that the religious liberty so precious to the citizens who make up our diverse country is protected, not impeded, when government avoids endorsing religion or favoring particular beliefs over others. Clearly, the government can *acknowledge* the role of religion in our society in numerous ways that do not amount to an endorsement. See *Lynch, supra,* at 693 (concurring opinion). Moreover, the government can *accommodate* religion by lifting governmentimposed burdens on religion. See *Wallace* v. *Jaffree,* 472

U. S., at 83–84 (opinion concurring in judgment). Indeed, the Free Exercise Clause may mandate that it do so in particular cases. In cases involving the lifting of government burdens on the free exercise of religion, a reasonable observer would take into account the values underlying the Free Exercise Clause in assessing whether the challenged practice conveyed a message of endorsement. *Id.*, at ·83. By "build[ing] on the concerns at the core of nonestablishment doctrine and recogniz[ing] the role of accommodations in furthering free exercise," the endorsement test "provides a standard capable of consistent application and avoids the criticism levelled against the *Lemon* test." Rostain, Permissible Accommodations of Religion: Reconsidering the New York *Get* Statute, 96 Yale L. J. 1147, 1159–1160 (1987). The cases before the Court today, however, do not involve lifting a governmental burden on the free exercise of religion. By repeatedly using the terms "acknowledgment" of religion and "accommodation" of religion interchangeably, however, *post*, at 662–664, 670, 678, JUSTICE KENNEDY obscures the fact that the displays at issue in these cases were not placed at city hall in order to remove a government-imposed burden on the free exercise of religion. Christians remain free to display their crèches at their homes and churches. *Ante*, at 601, n. 51. Allegheny County has neither placed nor removed a governmental burden on the free exercise of religion but rather, for the reasons stated in Part IV of the Court's opinion, has conveyed a message of governmental endorsement of Christian beliefs. This the Establishment Clause does not permit.

## III

For reasons which differ somewhat from those set forth in Part VI of JUSTICE BLACKMUN's opinion, I also conclude that the city of Pittsburgh's combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty does not have the effect of conveying an endorsement of religion. I agree with JUSTICE BLACKMUN, *ante*, at 616–617,

that the Christmas tree, whatever its origins, is not regarded today as a religious symbol. Although Christmas is a public holiday that has both religious and secular aspects, the Christmas tree is widely viewed as a secular symbol of the holiday, in contrast to the crèche which depicts the holiday's religious dimensions. A Christmas tree displayed in front of city hall, in my view, cannot fairly be understood as conveying government endorsement of Christianity. Although JUSTICE BLACKMUN's opinion acknowledges that a Christmas tree alone conveys no endorsement of Christian beliefs, it formulates the question posed by Pittsburgh's combined display of the tree and the menorah as whether the display "has the effect of endorsing *both* Christian and Jewish faiths, or rather simply recognizes that both Christmas and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society." *Ante,* at 616 (emphasis added).

That formulation of the question disregards the fact that the Christmas tree is a predominantly secular symbol and, more significantly, obscures the religious nature of the menorah and the holiday of Chanukah. The opinion is correct to recognize that the religious holiday of Chanukah has historical and cultural as well as religious dimensions, and that there may be certain "secular aspects" to the holiday. But that is not to conclude, however, as JUSTICE BLACKMUN seems to do, that Chanukah has become a "secular holiday" in our society. *Ante,* at 615. The Easter holiday celebrated by Christians may be accompanied by certain "secular aspects" such as Easter bunnies and Easter egg hunts; but it is nevertheless a religious holiday. Similarly, Chanukah is a religious holiday with strong historical components particularly important to the Jewish people. Moreover, the menorah is the central religious symbol and ritual object of that religious holiday. Under JUSTICE BLACKMUN's view, however, the menorah "has been relegated to the role of a neutral harbinger of the holiday season," *Lynch,* 465 U. S., at 727

(BLACKMUN, J., dissenting), almost devoid of any religious significance. In my view, the relevant question for Establishment Clause purposes is whether the city of Pittsburgh's display of the menorah, the religious symbol of a religious holiday, next to a Christmas tree and a sign saluting liberty sends a message of government endorsement of Judaism or whether it sends a message of pluralism and freedom to choose one's own beliefs.

In characterizing the message conveyed by this display as either a "double endorsement" or a secular acknowledgment of the winter holiday season, the opinion states that "[i]t is distinctly implausible to view the combined display of the tree, the sign, and the menorah as endorsing Jewish faith alone." *Ante,* at 616, n. 64. That statement, however, seems to suggest that it would be implausible for the city to endorse a faith adhered to by a minority of the citizenry. Regardless of the plausibility of a putative governmental purpose, the more important inquiry here is whether the governmental display of a minority faith's religious symbol could ever reasonably be understood to convey a message of endorsement of that faith. A menorah standing alone at city hall may well send such a message to nonadherents, just as in this case the crèche standing alone at the Allegheny County Courthouse sends a message of governmental endorsement of Christianity, whatever the county's purpose in authorizing the display may have been. Thus, the question here is whether Pittsburgh's holiday display conveys a message of endorsement of Judaism, when the menorah is the only religious symbol in the combined display and when the opinion acknowledges that the tree cannot reasonably be understood to convey an endorsement of Christianity. One need not characterize Chanukah as a "secular" holiday or strain to argue that the menorah has a "secular" dimension, *ante,* at 587, n. 34, in order to conclude that the city of Pittsburgh's combined display does not convey a message of endorsement of Judaism or of religion in general.

In setting up its holiday display, which included the lighted tree and the menorah, the city of Pittsburgh stressed the theme of liberty and pluralism by accompanying the exhibit with a sign bearing the following message: "'During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.'" *Ante*, at 582. This sign indicates that the city intended to convey its own distinctive message of pluralism and freedom. By accompanying its display of a Christmas tree—a secular symbol of the Christmas holiday season—with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season. "Although the religious and indeed sectarian significance" of the menorah "is not neutralized by the setting," *Lynch*, 465 U. S., at 692 (concurring opinion), this particular physical setting "changes what viewers may fairly understand to be the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Ibid.*

The message of pluralism conveyed by the city's combined holiday display is not a message that endorses religion over nonreligion. Just as government may not favor particular religious beliefs over others, "government may not favor religious belief over disbelief." *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 27 (1989) (BLACKMUN, J., concurring in judgment); *Wallace* v. *Jaffree*, 472 U. S., at 52–54; *id.*, at 70 (O'CONNOR, J., concurring in judgment). Here, by displaying a secular symbol of the Christmas holiday season rather than a religious one, the city acknowledged a public holiday celebrated by both religious and nonreligious citizens alike, and it did so without endorsing Christian beliefs. A reasonable observer would, in my view, appreciate that the com-

bined display is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens. In short, in the holiday context, this combined display in its particular physical setting conveys neither an endorsement of Judaism or Christianity nor disapproval of alternative beliefs, and thus does not have the impermissible effect of "mak[ing] religion relevant, in reality or public perception, to status in the political community." *Lynch, supra,* at 692 (concurring opinion).

My conclusion does not depend on whether or not the city had "a more secular alternative symbol" of Chanukah, *ante,* at 618, just as the Court's decision in *Lynch* clearly did not turn on whether the city of Pawtucket could have conveyed its tribute to the Christmas holiday season by using a "less religious" alternative to the crèche symbol in its display of traditional holiday symbols. See *Lynch, supra,* at 681, n. 7 ("JUSTICE BRENNAN argues that the city's objectives could have been achieved without including the crèche in the display, [465 U. S.,] at 699. True or not, that is irrelevant. The question is whether the display of the crèche violates the Establishment Clause"). In my view, JUSTICE BLACKMUN's new rule, *ante,* at 618, that an inference of endorsement arises every time government uses a symbol with religious meaning if a "more secular alternative" is available is too blunt an instrument for Establishment Clause analysis, which depends on sensitivity to the context and circumstances presented by each case. Indeed, the opinion appears to recognize the importance of this contextual sensitivity by creating an exception to its new rule in the very case announcing it: the opinion acknowledges that "a purely secular symbol" of Chanukah is available, namely, a dreidel or four-sided top, but rejects the use of such a symbol because it "might be interpreted by some as mocking the celebration of Chanukah." *Ibid.* This recognition that the more *religious*

alternative may, depending on the circumstances, convey a message that is least likely to implicate Establishment Clause concerns is an excellent example of the need to focus on the specific practice in question in its particular physical setting and context in determining whether government has conveyed or attempted to convey a message that religion or a particular religious belief is favored or preferred.

In sum, I conclude that the city of Pittsburgh's combined holiday display had neither the purpose nor the effect of endorsing religion, but that Allegheny County's crèche display had such an effect. Accordingly, I join Parts I, II, III–A, IV, V, and VII of the Court's opinion and concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, concurring in part and dissenting in part.

I have previously explained at some length my views on the relationship between the Establishment Clause and government-sponsored celebrations of the Christmas holiday. See *Lynch* v. *Donnelly,* 465 U. S. 668, 694–726 (1984) (dissenting opinion). I continue to believe that the display of an object that "retains a specifically Christian [or other] religious meaning," *id.,* at 708, is incompatible with the separation of church and state demanded by our Constitution. I therefore agree with the Court that Allegheny County's display of a crèche at the county courthouse signals an endorsement of the Christian faith in violation of the Establishment Clause, and join Parts III–A, IV, and V of the Court's opinion. I cannot agree, however, that the city's display of a 45-foot Christmas tree and an 18-foot Chanukah menorah at the entrance to the building housing the mayor's office shows no favoritism towards Christianity, Judaism, or both. Indeed, I should have thought that the answer as to the first display supplied the answer to the second.

According to the Court, the crèche display sends a message endorsing Christianity because the crèche itself bears a

religious meaning, because an angel in the display carries a banner declaring "Glory to God in the highest!," and because the floral decorations surrounding the crèche highlight it rather than secularize it. The display of a Christmas tree and Chanukah menorah, in contrast, is said to show no endorsement of a particular faith or faiths, or of religion in general, because the Christmas tree is a secular symbol which brings out the secular elements of the menorah. *Ante,* at 616–617. And, JUSTICE BLACKMUN concludes, even though the menorah has religious aspects, its display reveals no endorsement of religion because no other symbol could have been used to represent the secular aspects of the holiday of Chanukah without mocking its celebration. *Ante,* at 618. Rather than endorsing religion, therefore, the display merely demonstrates that "Christmas is not the only traditional way of observing the winter-holiday season," and confirms our "cultural diversity." *Ante,* at 617, 619.

Thus, the decision as to the menorah rests on three premises: the Christmas tree is a secular symbol; Chanukah is a holiday with secular dimensions, symbolized by the menorah; and the government may promote pluralism by sponsoring or condoning displays having strong religious associations on its property. None of these is sound.

I

The first step toward JUSTICE BLACKMUN's conclusion is the claim that, despite its religious origins, the Christmas tree is a secular symbol. He explains:

> "The Christmas tree, unlike the menorah, is not itself a religious symbol. Although Christmas trees once carried religious connotations, today they typify the secular celebration of Christmas. Numerous Americans place Christmas trees in their homes without subscribing to Christian religious beliefs, and when the city's tree stands alone in front of the City-County Building, it is not considered an endorsement of Christian faith. In-

deed, a 40-foot Christmas tree was one of the objects that validated the crèche in *Lynch*. The widely accepted view of the Christmas tree as the preeminent secular symbol of the Christmas holiday season serves to emphasize the secular component of the message communicated by other elements of an accompanying holiday display, including the Chanukah menorah." *Ante*, at 616–617 (citations and footnotes omitted).

JUSTICE O'CONNOR accepts this view of the Christmas tree because, "whatever its origins, [it] is not regarded today as a religious symbol. Although Christmas is a public holiday that has both religious and secular aspects, the Christmas tree is widely viewed as a secular symbol of the holiday, in contrast to the crèche which depicts the holiday's religious dimensions." *Ante*, at 633.

Thus, while acknowledging the religious origins of the Christmas tree, JUSTICES BLACKMUN and O'CONNOR dismiss their significance. In my view, this attempt to take the "Christmas" out of the Christmas tree is unconvincing. That the tree may, without controversy, be deemed a secular symbol if found alone does not mean that it will be so seen when combined with other symbols or objects. Indeed, JUSTICE BLACKMUN admits that "the tree is capable of taking on a religious significance if it is decorated with religious symbols." *Ante*, at 617, n. 65.

The notion that the Christmas tree is necessarily secular is, indeed, so shaky that, despite superficial acceptance of the idea, JUSTICE O'CONNOR does not really take it seriously. While conceding that the "menorah standing alone at city hall may well send" a message of endorsement of the Jewish faith, she nevertheless concludes: "By accompanying its display of a Christmas tree—a secular symbol of the Christmas holiday season—with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a mes-

sage of pluralism and freedom of belief during the holiday season." *Ante*, at 635. But the "pluralism" to which JUS-TICE O'CONNOR refers is *religious* pluralism, and the "free-dom of belief" she emphasizes is freedom of *religious* belief.* The display of the tree and the menorah will symbolize such pluralism and freedom only if more than one religion is repre-sented; if only Judaism is represented, the scene is about Ju-daism, not about pluralism. Thus, the pluralistic message JUSTICE O'CONNOR stresses *depends on* the tree's possessing some religious significance.

In asserting that the Christmas tree, regardless of its sur-roundings, is a purely secular symbol, JUSTICES BLACKMUN and O'CONNOR ignore the precept they otherwise so enthusi-astically embrace: that context is all important in determin-ing the message conveyed by particular objects. See *ante*, at 597 (BLACKMUN, J.) (relevant question is "whether the

---

*If it is not religious pluralism that the display signifies, then I do not know what kind of "pluralism" JUSTICE O'CONNOR has in mind. Perhaps she means the cultural pluralism that results from recognition of many dif-ferent holidays, religious and nonreligious. In that case, however, the dis-play of a menorah next to a giant firecracker, symbolic of the Fourth of July, would seem to be equally representative of this pluralism, yet I do not sense that this display would pass muster under JUSTICE O'CONNOR's view. If, instead, JUSTICE O'CONNOR means to approve the pluralistic message associated with a symbolic display that may stand for either the secular or religious aspects of a given holiday, then this view would logi-cally entail the conclusion that the display of a Latin cross next to an Easter bunny in the springtime would be valid under the Establishment Clause; again, however, I sense that such a conclusion would not comport with JUSTICE O'CONNOR's views. The final possibility, and the one that seems most consonant with the views outlined in her opinion, see *ante*, at 635, is that the pluralism that JUSTICE O'CONNOR perceives in Pittsburgh's display arises from the recognition that there are many different ways to celebrate "the winter holiday season," *ante*, at 636. But winter is *the* holiday season" to Christians, not to Jews, and the implicit message that it, rather than autumn, is the time for pluralism sends an impermissible signal that only holidays stemming from Christianity, not those arising from other religions, favorably dispose the government towards "plural-ism." See *infra*, at 645.

display of the crèche and the menorah, in their respective 'particular physical settings,' has the effect of endorsing or disapproving religious beliefs") (quoting *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 390 (1985)); *ante*, at 624 (O'CONNOR, J.) ("'[E]very government practice must be judged in its *unique circumstances* to determine whether it constitutes an endorsement or disapproval of religion'") (quoting *Lynch* v. *Donnelly*, 465 U. S., at 694 (O'CONNOR, J., concurring)); *ante*, at 636 (O'CONNOR, J.) ("Establishment Clause analysis . . . depends on sensitivity to the context and circumstances presented by each case"); *ante*, at 637 (O'CON-NOR, J.) (emphasizing "the need to focus on the specific prac-tice in question in its particular physical setting and con-text").    In analyzing the symbolic character of the Christmas tree, both JUSTICES BLACKMUN and O'CONNOR abandon this contextual inquiry.    In doing so, they go badly astray.

Positioned as it was, the Christmas tree's religious signifi-cance was bound to come to the fore.    Situated next to the menorah—which, JUSTICE BLACKMUN acknowledges, is "a symbol with religious meaning," *ante*, at 618, and indeed, is "the central religious symbol and ritual object of" Chanukah, *ante*, at 633 (O'CONNOR, J.)—the Christmas tree's religious dimension could not be overlooked by observers of the dis-play.    Even though the tree alone may be deemed predomi-nantly secular, it can hardly be so characterized when placed next to such a forthrightly religious symbol.    Consider a poster featuring a star of David, a statue of Buddha, a Christ-mas tree, a mosque, and a drawing of Krishna.    There can be no doubt that, when found in such company, the tree serves as an unabashedly religious symbol.

JUSTICE BLACKMUN believes that it is the tree that changes the message of the menorah, rather than the meno-rah that alters our view of the tree.    After the abrupt dis-missal of the suggestion that the flora surrounding the crèche might have diluted the religious character of the display at the county courthouse, *ante*, at 599, his quick conclusion that

the Christmas tree had a secularizing effect on the menorah is surprising. The distinguishing characteristic, it appears, is the size of the tree. The tree, we are told, is much taller— 2½ times taller, in fact—than the menorah, and is located directly under one of the building's archways, whereas the menorah "is positioned to one side . . . [i]n the shadow of the tree." *Ante,* at 617.

As a factual matter, it seems to me that the sight of an 18-foot menorah would be far more eye catching than that of a rather conventionally sized Christmas tree. It also seems to me likely that the symbol with the more singular message will predominate over one lacking such a clear meaning. Given the homogenized message that JUSTICE BLACKMUN associates with the Christmas tree, I would expect that the menorah, with its concededly religious character, would tend to dominate the tree. And, though JUSTICE BLACKMUN shunts the point to a footnote at the end of his opinion, *ante,* at 621, n. 70, it is highly relevant that the menorah was lit during a religious ceremony complete with traditional religious blessings. I do not comprehend how the failure to challenge separately this portion of the city's festivities precludes us from considering it in assessing the message sent by the display as a whole. But see *ibid.* With such an openly religious introduction, it is most likely that the religious aspects of the menorah would be front and center in this display.

I would not, however, presume to say that my interpretation of the tree's significance is the "correct" one, or the one shared by most visitors to the City-County Building. I do not know how we can decide whether it was the tree that stripped the religious connotations from the menorah, or the menorah that laid bare the religious origins of the tree. Both are reasonable interpretations of the scene the city presented, and thus both, I think, should satisfy JUSTICE BLACK-MUN's requirement that the display "be judged according to the standard of a 'reasonable observer.'" *Ante,* at 620. I

shudder to think that the only "reasonable observer" is one who shares the particular views on perspective, spacing, and accent expressed in JUSTICE BLACKMUN's opinion, thus making analysis under the Establishment Clause look more like an exam in Art 101 than an inquiry into constitutional law.

## II

The second premise on which today's decision rests is the notion that Chanukah is a partly secular holiday, for which the menorah can serve as a secular symbol. It is no surprise and no anomaly that Chanukah has historical and societal roots that range beyond the purely religious. I would venture that most, if not all, major religious holidays have beginnings and enjoy histories studded with figures, events, and practices that are not strictly religious. It does not seem to me that the mere fact that Chanukah shares this kind of background makes it a secular holiday in any meaningful sense. The menorah is indisputably a religious symbol, used ritually in a celebration that has deep religious significance. That, in my view, is all that need be said. Whatever secular practices the holiday of Chanukah has taken on in its contemporary observance are beside the point.

Indeed, at the very outset of his discussion of the menorah display, JUSTICE BLACKMUN recognizes that the menorah is a religious symbol. *Ante*, at 613. That should have been the end of the case. But, as did the Court in *Lynch*, JUSTICE BLACKMUN, "by focusing on the holiday 'context' in which the [menorah] appeared, seeks to explain away the clear religious import of the [menorah] . . . ." 465 U. S., at 705 (BRENNAN, J., dissenting). By the end of the opinion, the menorah has become but a coequal symbol, with the Christmas tree, of "the winter-holiday season." *Ante*, at 620. Pittsburgh's secularization of an inherently religious symbol, aided and abetted here by JUSTICE BLACKMUN's opinion, recalls the effort in *Lynch* to render the crèche a secular symbol. As I said then: "To suggest, as the Court does, that such a symbol

is merely 'traditional' and therefore no different from Santa's house or reindeer is not only offensive to those for whom the crèche has profound significance, but insulting to those who insist for religious or personal reasons that the story of Christ is in no sense a part of 'history' nor an unavoidable element of our national 'heritage.'" 465 U. S., at 711–712. As JUSTICE O'CONNOR rightly observes, JUSTICE BLACKMUN "obscures the religious nature of the menorah and the holiday of Chanukah." *Ante*, at 633.

I cannot, in short, accept the effort to transform an emblem of religious faith into the innocuous "symbol for a holiday that . . . has both religious and secular dimensions." *Ante*, at 614 (BLACKMUN, J.).

## III

JUSTICE BLACKMUN, in his acceptance of the city's message of "diversity," *ante*, at 619, and, even more so, JUSTICE O'CONNOR, in her approval of the "message of pluralism and freedom to choose one's own beliefs," *ante*, at 634, appear to believe that, where seasonal displays are concerned, more is better. Whereas a display might be constitutionally problematic if it showcased the holiday of just one religion, those problems vaporize as soon as more than one religion is included. I know of no principle under the Establishment Clause, however, that permits us to conclude that governmental promotion of religion is acceptable so long as one religion is not favored. We have, on the contrary, interpreted that Clause to require neutrality, not just among religions, but between religion and nonreligion. See, *e. g., Everson* v. *Board of Education of Ewing*, 330 U. S. 1, 15 (1947); *Wallace* v. *Jaffree*, 472 U. S. 38, 52–54 (1985).

Nor do I discern the theory under which the government is permitted to appropriate particular holidays and religious objects to its own use in celebrating "pluralism." The message of the sign announcing a "Salute to Liberty" is not religious, but patriotic; the government's use of religion to promote its

own cause is undoubtedly offensive to those whose religious beliefs are not bound up with their attitude toward the Nation.

The uncritical acceptance of a message of religious pluralism also ignores the extent to which even that message may offend. Many religious faiths are hostile to each other, and indeed, refuse even to participate in ecumenical services designed to demonstrate the very pluralism JUSTICES BLACKMUN and O'CONNOR extol. To lump the ritual objects and holidays of religions together without regard to their attitudes toward such inclusiveness, or to decide which religions should be excluded because of the possibility of offense, is not a benign or beneficent celebration of pluralism: it is instead an interference in religious matters precluded by the Establishment Clause.

The government-sponsored display of the menorah alongside a Christmas tree also works a distortion of the Jewish religious calendar. As JUSTICE BLACKMUN acknowledges, "the proximity of Christmas [may] accoun[t] for the social prominence of Chanukah in this country." *Ante,* at 586. It is the proximity of Christmas that undoubtedly accounts for the city's decision to participate in the celebration of Chanukah, rather than the far more significant Jewish holidays of Rosh Hashanah and Yom Kippur. Contrary to the impression the city and JUSTICES BLACKMUN and O'CONNOR seem to create, with their emphasis on "the winter-holiday season," December is not the holiday season for Judaism. Thus, the city's erection alongside the Christmas tree of the symbol of a relatively minor Jewish religious holiday, far from conveying "the city's secular recognition of different traditions for celebrating the winter-holiday season," *ante,* at 620 (BLACKMUN, J.), or "a message of pluralism and freedom of belief," *ante,* at 635 (O'CONNOR, J.), has the effect of promoting a Christianized version of Judaism. The holiday calendar they appear willing to accept revolves exclusively around a Christian holiday. And those religions that have

no holiday at all during the period between Thanksgiving and New Year's Day will not benefit, even in a second-class manner, from the city's once-a-year tribute to "liberty" and "freedom of belief." This is not "pluralism" as I understand it.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and dissenting in part.

Governmental recognition of not one but two religions distinguishes these cases from our prior Establishment Clause cases. It is, therefore, appropriate to reexamine the text and context of the Clause to determine its impact on this novel situation.

Relations between church and state at the end of the 1780's fell into two quite different categories. In several European countries, one national religion, such as the Church of England in Great Britain, was established. The established church typically was supported by tax revenues, by laws conferring privileges only upon members, and sometimes by violent persecution of nonadherents. In contrast, although several American Colonies had assessed taxes to support one chosen faith, none of the newly United States subsidized a single religion. Some States had repealed establishment laws altogether, while others had replaced single establishments with laws providing for nondiscriminatory support of more than one religion.[1]

---

[1] The history of religious establishments is discussed in, *e. g.*, J. Swomley, Religious Liberty and the Secular State 24–41 (1987) (Swomley). See generally L. Levy, The Establishment Clause (1986) (Levy). One historian describes the situation at the time of the passage of the First Amendment as follows:

"In America there was no establishment of a single church, as in England. Four states had never adopted any establishment practices. Three had abolished their establishments during the Revolution. The remaining six states—Massachusetts, New Hampshire, Connecticut, Maryland, South Carolina, and Georgia—changed to comprehensive or 'multiple' establishments. That is, aid was provided to all churches in each state on a nonpreferential basis, except that the establishment was limited to churches of

It is against this historical backdrop that James Madison, then a Representative from Virginia, rose to the floor of the First Congress on June 8, 1789, and proposed a number of amendments to the Constitution, including the following:

> "The civil rights of none shall be abridged on account of religious belief or worship, *nor shall any national religion be established,* nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." 1 Annals of Cong. 434 (1789) (emphasis added).

Congressional debate produced several reformulations of the italicized language.[2] One Member suggested the words "Congress shall make no laws *touching religion,*" *id.,* at 731 (emphasis added), soon amended to "Congress shall make no law *establishing religion,*" *id.,* at 766 (emphasis added). After further alteration, this passage became one of the Religion Clauses of the First Amendment. Ratified in 1791, they state that "Congress shall make no law *respecting an establishment of religion,* or prohibiting the free exercise thereof," U. S. Const., Amdt. 1 (emphasis added).

By its terms the initial draft of the Establishment Clause would have prohibited only the national established church that prevailed in England; multiple establishments, such as existed in six States, would have been permitted. But even

---

the Protestant religion in three states and to those of the Christian religion in the other three states. Since there were almost no Catholics in the first group of states, and very few Jews in any state, this meant that the multiple establishment practices included every religious group with enough members to form a church. It was this nonpreferential assistance to organized churches that constituted 'establishment of religion' in 1791, and it was this practice that the amendment forbade Congress to adopt." C. Pritchett, The American Constitution 401 (3d ed. 1977).

[2] For a comprehensive narration of this process, see Levy 75–89. See also, *e. g., Wallace* v. *Jaffree,* 472 U. S. 38, 92–97 (1985) (REHNQUIST, J., dissenting); Swomley 43–49; Drakeman, Religion and the Republic: James Madison and the First Amendment, in James Madison on Religious Liberty 233–235 (R. Alley ed. 1985).

in those States and even among members of the established churches, there was widespread opposition to multiple establishments because of the social divisions they caused.[3] Perhaps in response to this opposition, subsequent drafts broadened the scope of the Establishment Clause from "any national religion" to "religion," a word understood primarily to mean "[v]irtue, as founded upon reverence of God, and expectation of future rewards and punishments," and only secondarily "[a] system of divine faith and worship, as opposite to others." S. Johnson, A Dictionary of the English Language (7th ed. 1785); accord, T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796). Cf. *Frazee* v. *Illinois Dept. of Employment Security*, 489 U. S. 829, 834 (1989) (construing "religion" protected by Free Ex-

---

[3] "Other members of the established church also disapproved taxation for religious purposes. One of these, James Sullivan, who was later elected Governor of Massachusetts, wrote about such taxation: 'This glaring piece of religious tyranny was founded upon one or the other of these suppositions: that the church members were more religious, had more understanding, or had a higher privilege than, or a preeminence over those who were not in full communion, or in other words, that their growth in grace or religious requirements, gave them the right of taking and disposing of the property of other people against their consent.'

"The struggle for religious liberty in Massachusetts was the struggle against taxation for religious purposes. In that struggle there was civil disobedience; there were appeals to the Court and to the Crown in faraway England. Societies were organized to fight the tax. Even after some denominations had won the right to be taxed only for their own churches or meetings, they continued to resist the tax, even on the nonpreferential basis by which all organized religious groups received tax funds. Finally, the state senate, which had refused to end establishment, voted in 1831 to submit the issue to the people. The vote, which took place in 1833, was 32,234 for disestablishment to 3,273 for keeping the multiple establishments of religion. It was a 10 to 1 vote, and in 1834 the amendment was made effective by legislation." Swomley 28.

Cf. *Engel* v. *Vitale*, 370 U. S. 421, 432 (1962) ("Another purpose of the Establishment Clause rested upon an awareness of the historical fact that governmentally established religions and religious persecutions go hand in hand").

ercise Clause to include "sincerely held religious belief" apart from "membership in an organized religious denomination"). Plainly, the Clause as ratified proscribes federal legislation establishing a number of religions as well as a single national church.[4]

Similarly expanded was the relationship between government and religion that was to be disallowed. Whereas earlier drafts had barred only laws "establishing" or "touching" religion, the final text interdicts all laws "respecting an establishment of religion." This phrase forbids even a partial establishment, *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971); *Engel* v. *Vitale*, 370 U. S. 421, 436 (1962), not only of a particular sect in favor of others, but also of religion in preference to nonreligion, *Wallace* v. *Jaffree*, 472 U. S. 38, 52 (1985). It is also significant that the final draft contains the word "respecting." Like "touching," "respecting" means concerning, or with reference to. But it also means with respect—that is, "reverence," "good will," "regard"—to.[5] Taking into account this richer meaning, the Establishment Clause, in banning laws that concern religion, especially prohibits those that pay homage to religion.

Treatment of a symbol of a particular tradition demonstrates one's attitude toward that tradition. Cf. *Texas* v. *Johnson*, 491 U. S. 397 (1989). Thus the prominent display of religious symbols on government property falls within the compass of the First Amendment, even though interference with personal choices about supporting a church, by means of governmental tithing, was the primary concern in 1791. See *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 668 (1970); n. 3, *supra*. Whether the vice in such a display is

---

[4] This proscription applies to the States by virtue of the Fourteenth Amendment. *Jaffree*, 472 U. S., at 48–55.

[5] "Respect," as defined in T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796). See S. Johnson, A Dictionary of the English Language (7th ed. 1785); see also The Oxford English Dictionary 733–734 (1989); Webster's Ninth New Collegiate Dictionary 1004 (1988).

characterized as "coercion," see *post*, at 660–661 (KENNEDY, J., concurring in judgment in part and dissenting in part), or "endorsement," see *ante*, at 625 (O'CONNOR, J., concurring in part and concurring in judgment), or merely as state action with the purpose and effect of providing support for specific faiths, cf. *Lemon*, 403 U. S., at 612, it is common ground that this symbolic governmental speech "respecting an establishment of religion" may violate the Constitution.[6]   Cf. *Jaffree*, 472 U. S., at 60–61; *Lynch* v. *Donnelly*, 465 U. S. 668 (1984).

In my opinion the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property.[7]   There is always a

---

[6] The criticism that JUSTICE KENNEDY levels at JUSTICE O'CONNOR's endorsement standard for evaluating symbolic speech, see *post*, at 668–678, is not only "uncharitable," *post*, at 675, but also largely unfounded. *Inter alia*, he neglects to mention that 1 of the 2 articles he cites as disfavoring the endorsement test, *post*, at 669, itself cites no fewer than 16 articles and 1 book lauding the test.   See Smith, Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Endorsement" Test, 86 Mich. L. Rev. 266, 274, n. 45 (1987).   JUSTICE KENNEDY's preferred "coercion" test, moreover, is, as he himself admits, *post*, at 660, out of step with our precedent.   The Court has stated:

"The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." *Engel*, 370 U. S., at 430.

Even if the law were not so, it seems unlikely that "coercion" identifies the line between permissible and impermissible religious displays any more brightly than does "endorsement."

[7] In a similar vein, we have interpreted the Amendment's strictly worded Free Speech and Free Press Clauses to raise a strong presumption against, rather than to ban outright, state abridgment of communications. See, *e. g.*, *Roaden* v. *Kentucky*, 413 U. S. 496, 504 (1973).   By suggesting such a presumption plays a role in considering governmental symbolic speech about religion, I do not retreat from my position that a " 'high and impregnable' wall" should separate government funds from parochial schools' treasuries.   See *Committee for Public Education and Religious*

risk that such symbols will offend nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful. Some devout Christians believe that the crèche should be placed only in reverential settings, such as a church or perhaps a private home; they do not countenance its use as an aid to commercialization of Christ's birthday. Cf. *Lynch*, 465 U. S., at 726–727 (BLACKMUN, J., dissenting).[8] In this very suit, members of the Jewish faith firmly opposed the use to which the menorah was put by the particular sect that sponsored the display at Pittsburgh's City-County Building.[9] Even though "[p]assersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs," see *post*, at 664 (KENNEDY, J., concurring in judgment in part and dissenting in part), displays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal. The Establishment Clause does not allow public bodies to foment such disagreement.[10]

---

*Liberty* v. *Regan*, 444 U. S. 646, 671 (1980) (STEVENS, J., dissenting) (quoting *Everson* v. *Board of Education of Ewing*, 330 U. S. 1, 18 (1947)).

[8] The point is reiterated here by *amicus* the Governing Board of the National Council of Churches of Christ in the U. S. A., which argues that "government acceptance of a crèche on public property . . . secularizes and degrades a sacred symbol of Christianity," Brief for American Jewish Committee et al. as *Amici Curiae* ii. See also *Engel*, 370 U. S., at 431. Indeed two Roman Catholics testified before the District Court in this case that the crèche display offended them. App. 79–80, 93–96.

[9] See Brief for American Jewish Committee et al. as *Amici Curiae* i–ii; Brief for American Jewish Congress et al. as *Amici Curiae* 1–2; Tr. of Oral Arg. 44.

[10] These cases illustrate the danger that governmental displays of religious symbols may give rise to unintended divisiveness, for the net result of the Court's disposition is to disallow the display of the crèche but to allow the display of the menorah. Laypersons unfamiliar with the intricacies of Establishment Clause jurisprudence may reach the wholly unjustified conclusion that the Court itself is preferring one faith over another. See *Goldman* v. *Weinberger*, 475 U. S. 503, 512–513 (1986) (STEVENS, J.,

Application of a strong presumption against the public use of religious symbols scarcely will "require a relentless extirpation of all contact between government and religion," see *post*, at 657 (KENNEDY, J., concurring in judgment in part and dissenting in part),[11] for it will prohibit a display only when its message, evaluated in the context in which it is presented, is nonsecular.[12] For example, a carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law. The addition of carvings depicting Confucius and Mohammed may honor religion, or particular religions, to an extent that the First Amendment does not tolerate any more than it does "the permanent erection of a large Latin cross on the roof of city hall." See *post*, at 661 (KENNEDY, J., concurring in judgment in part and dissenting in part). Cf. *Stone* v. *Graham*, 449 U. S. 39 (1980) *(per curiam)*. Placement of secular figures such as Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall alongside these three religious leaders, however, signals respect not

---

concurring). Cf. *Lemon* v. *Kurtzman*, 403 U. S. 602, 623 (1971) ("[T]he Constitution's authors sought to protect religious worship from the pervasive power of government"); *Engel*, 370 U. S., at 430 ("Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause").

[11] The suggestion that the only alternative to governmental support of religion is governmental hostility to it represents a giant step backward in our Religion Clause jurisprudence. Indeed in its first contemporary examination of the Establishment Clause, the Court, while differing on how to apply the principle, unanimously agreed that government could not require believers or nonbelievers to support religions. *Everson* v. *Board of Education of Ewing*, 330 U. S., at 15–16; see also *id.*, at 31–33 (Rutledge, J., dissenting). Accord, *Jaffree*, 472 U. S., at 52–55.

[12] Cf. *New York* v. *Ferber*, 458 U. S. 747, 778 (1982) (STEVENS, J., concurring in judgment) ("The question whether a specific act of communication is protected by the First Amendment always requires some consideration of both its content and its context").

for great proselytizers but for great lawgivers. It would be absurd to exclude such a fitting message from a courtroom,[13] as it would to exclude religious paintings by Italian Renaissance masters from a public museum. Cf. *Lynch*, 465 U. S., at 712–713, 717 (BRENNAN, J., dissenting). Far from "border[ing] on latent hostility toward religion," see *post*, at 657 (KENNEDY, J., concurring in judgment in part and dissenting in part), this careful consideration of context gives due regard to religious and nonreligious members of our society.[14]

Thus I find wholly unpersuasive JUSTICE KENNEDY's attempts, *post*, at 664–667, to belittle the importance of the obvious differences between the display of the crèche in this case and that in *Lynch* v. *Donnelly*, 465 U. S. 668 (1984). Even if I had not dissented from the Court's conclusion that the crèche in *Lynch* was constitutional, I would conclude that Allegheny County's unambiguous exposition of a sacred symbol inside its courthouse promoted Christianity to a degree

---

[13] All these leaders, of course, appear in friezes on the walls of our courtroom. See The Supreme Court of the United States 31 (published with the cooperation of the Historical Society of the Supreme Court of the United States).

[14] The Court long ago rejected a contention similar to that JUSTICE KENNEDY advances today:

"It has been argued that to apply the Constitution in such a way as to prohibit state laws respecting an establishment of religious services in public schools is to indicate a hostility toward religion or toward prayer. Nothing, of course, could be more wrong. The history of man is inseparable from the history of religion. . . . [Early Americans] knew that the First Amendment, which tried to put an end to governmental control of religion and of prayer, was not written to destroy either. They knew rather that it was written to quiet well-justified fears which nearly all of them felt arising out of an awareness that governments of the past had shackled men's tongues to make them speak only the religious thoughts that government wanted them to speak and to pray only to the God that government wanted them to pray to. It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Engel*, 370 U. S., at 433–435 (footnotes omitted).

that violated the Establishment Clause. Accordingly, I concur in the Court's judgment regarding the crèche for substantially the same reasons discussed in JUSTICE BRENNAN's opinion, which I join, as well as Part IV of JUSTICE BLACKMUN's opinion and Part I of JUSTICE O'CONNOR's opinion.

I cannot agree with the Court's conclusion that the display at Pittsburgh's City-County Building was constitutional. Standing alone in front of a governmental headquarters, a lighted, 45-foot evergreen tree might convey holiday greetings linked too tenuously to Christianity to have constitutional moment. Juxtaposition of this tree with an 18-foot menorah does not make the latter secular, as JUSTICE BLACKMUN contends, *ante*, at 616. Rather, the presence of the Chanukah menorah, unquestionably a religious symbol,[15] gives religious significance to the Christmas tree. The overall display thus manifests governmental approval of the Jewish and Christian religions. Cf. *Jaffree*, 472 U. S., at 60–61 (quoting *Lynch*, 465 U. S., at 690–691 (O'CONNOR, J., con-

---

[15] After the judge and counsel for both sides agreed at a preliminary injunction hearing that the menorah was a religious symbol, App. 144–145, a rabbi testified as an expert witness that the menorah and the crèche "are comparable symbols, that they both represent what we perceive to be miracles," *id.*, at 146, and that he had never "heard of Hanukkah being declared a general secular holiday in the United States," *id.*, at 148. Although a witness for intervenor Chabad testified at a later hearing that "[w]hen used on Hanukkah in the home it is definitely symbolizing a religious ritual . . . whereas, at other times the menorah can symbolize anything that one wants it to symbolize," *id.*, at 240, he also agreed that lighting the menorah in a public place "probably would" publicize the miracle it represents, *id.*, at 263.

Nonetheless, JUSTICE BLACKMUN attaches overriding secular meaning to the menorah. *Ante*, at 613–616. Contra, *ante*, at 632–634 (O'CONNOR, J., concurring in part and concurring in judgment); *ante*, at 638, 641–643 (BRENNAN, J., concurring in part and dissenting in part); *post*, at 664 (KENNEDY, J., concurring in judgment in part and dissenting in part). He reaches this conclusion only after exhaustive reference, not only to facts of record but primarily to academic treatises, to assess the degrees to which the menorah, the tree, and the crèche are religious or secular. *Ante*, at 579–587, 616.

curring)).  Although it conceivably might be interpreted as sending "a message of pluralism and freedom to choose one's own beliefs," *ante*, at 634 (O'CONNOR, J., concurring in part and concurring in judgment); accord, *ante*, at 617–618 (opinion of BLACKMUN, J.), the message is not sufficiently clear to overcome the strong presumption that the display, respecting two religions to the exclusion of all others, is the very kind of double establishment that the First Amendment was designed to outlaw.  I would, therefore, affirm the judgment of the Court of Appeals in its entirety.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join, concurring in the judgment in part and dissenting in part.

The majority holds that the County of Allegheny violated the Establishment Clause by displaying a crèche in the county courthouse, because the "principal or primary effect" of the display is to advance religion within the meaning of *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613 (1971).  This view of the Establishment Clause reflects an unjustified hostility toward religion, a hostility inconsistent with our history and our precedents, and I dissent from this holding. The crèche display is constitutional, and, for the same reasons, the display of a menorah by the city of Pittsburgh is permissible as well.  On this latter point, I concur in the result, but not the reasoning, of Part VI of JUSTICE BLACKMUN's opinion.

I

In keeping with the usual fashion of recent years, the majority applies the *Lemon* test to judge the constitutionality of the holiday displays here in question.  I am content for present purposes to remain within the *Lemon* framework, but do not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area.  Persuasive criticism of *Lemon* has emerged.  See *Edwards* v. *Aguillard,* 482 U. S. 578, 636–640 (1987) (SCALIA, J., dissenting);

*Aguilar* v. *Felton,* 473 U. S. 402, 426–430 (1985) (O'CONNOR, J., dissenting); *Wallace* v. *Jaffree,* 472 U. S. 38, 108–113 (1985) (REHNQUIST, J., dissenting); *Roemer* v. *Maryland Bd. of Public Works,* 426 U. S. 736, 768–769 (1976) (WHITE, J., concurring in judgment). Our cases often question its utility in providing concrete answers to Establishment Clause questions, calling it but a " 'helpful signpos[t]' " or " 'guidelin[e]' " to assist our deliberations rather than a comprehensive test. *Mueller* v. *Allen,* 463 U. S. 388, 394 (1983) (quoting *Hunt* v. *McNair,* 413 U. S. 734, 741 (1973)); *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 773, n. 31 (1973) (quoting *Tilton* v. *Richardson,* 403 U. S. 672, 677–678 (1971)); see *Lynch* v. *Donnelly,* 465 U. S. 668, 679 (1984) ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area"). Substantial revision of our Establishment Clause doctrine may be in order; but it is unnecessary to undertake that task today, for even the *Lemon* test, when applied with proper sensitivity to our traditions and our case law, supports the conclusion that both the crèche and the menorah are permissible displays in the context of the holiday season.

The only *Lemon* factor implicated in these cases directs us to inquire whether the "principal or primary effect" of the challenged government practice is "one that neither advances nor inhibits religion." 403 U. S., at 612. The requirement of neutrality inherent in that formulation has sometimes been stated in categorical terms. For example, in *Everson* v. *Board of Education of Ewing,* 330 U. S. 1 (1947), the first case in our modern Establishment Clause jurisprudence, Justice Black wrote that the Clause forbids laws "which aid one religion, aid all religions, or prefer one religion over another." *Id.,* at 15–16. We have stated that government "must be neutral in matters of religious theory, doctrine, and practice" and "may not aid, foster, or promote one religion or religious theory against another or even against the

militant opposite." *Epperson* v. *Arkansas,* 393 U. S. 97, 103–104 (1968). And we have spoken of a prohibition against conferring an "'imprimatur of state approval'" on religion, *Mueller* v. *Allen, supra,* at 399 (quoting *Widmar* v. *Vincent,* 454 U. S. 263, 274 (1981)), or "favor[ing] the adherents of any sect or religious organization," *Gillette* v. *United States,* 401 U. S. 437, 450 (1971).

These statements must not give the impression of a formalism that does not exist. Taken to its logical extreme, some of the language quoted above would require a relentless extirpation of all contact between government and religion. But that is not the history or the purpose of the Establishment Clause. Government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage. As Chief Justice Burger wrote for the Court in *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664 (1970), we must be careful to avoid "[t]he hazards of placing too much weight on a few words or phrases of the Court," and so we have "declined to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history." *Id.,* at 670–671.

Rather than requiring government to avoid any action that acknowledges or aids religion, the Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society. *Lynch* v. *Donnelly, supra,* at 678; *Walz* v. *Tax Comm'n of New York City, supra,* at 669. Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious. A categorical approach would install federal courts as jealous guardians of an absolute "wall of separation," sending a clear message of disapproval. In this century, as the modern administrative state expands to touch the lives of its citizens in such diverse ways and redi-

rects their financial choices through programs of its own, it is difficult to maintain the fiction that requiring government to avoid all assistance to religion can in fairness be viewed as serving the goal of neutrality.

Our cases reflect this understanding. In *Zorach* v. *Clauson*, 343 U. S. 306 (1952), for example, we permitted New York City's public school system to accommodate the religious preferences of its students by giving them the option of staying in school or leaving to attend religious classes for part of the day. Justice Douglas wrote for the Court:

> "When the state encourages religious instruction . . . it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe." *Id.*, at 313–314.

Nothing in the First Amendment compelled New York City to establish the release-time policy in *Zorach*, but the fact that the policy served to aid religion, and in particular those sects that offer religious education to the young, did not invalidate the accommodation. Likewise, we have upheld government programs supplying textbooks to students in parochial schools, *Board of Education of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236 (1968), providing grants to church-sponsored universities and colleges, *Roemer* v. *Maryland Bd. of Public Works, supra; Tilton* v. *Richardson, supra,* and exempting churches from the obligation to pay taxes, *Walz* v. *Tax Comm'n of New York City, supra.* These programs all have the effect of providing substantial benefits to particular religions, see, *e. g., Tilton, supra,* at 679 (grants to church-sponsored educational institutions "surely aid" those institutions), but they are nonetheless permissible. See *Lynch* v. *Donnelly, supra; McGowan* v.

*Maryland*, 366 U. S. 420, 445 (1961); *Illinois ex rel. Mc-Collum* v. *Board of Education of School Dist. No. 71, Champaign County*, 333 U. S. 203, 211–212 (1948). As Justice Goldberg wrote in *Abington School District* v. *Schempp*, 374 U. S. 203 (1963):

> "It is said, and I agree, that the attitude of government toward religion must be one of neutrality. But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.
>
> Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion . . . ." *Id.*, at 306 (concurring opinion, joined by Harlan, J.).

The ability of the organized community to recognize and accommodate religion in a society with a pervasive public sector requires diligent observance of the border between accommodation and establishment. Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact "establishes a [state] religion or religious faith, or tends to do so." *Lynch* v. *Donnelly*, 465 U. S., at 678. These two principles, while distinct, are not unrelated, for it would be difficult indeed to establish a religion without some measure of more or less subtle coercion, be it in the form of taxation to supply the substantial benefits that would sustain

a state-established faith, direct compulsion to observance, or governmental exhortation to religiosity that amounts in fact to proselytizing.

It is no surprise that without exception we have invalidated actions that further the interests of religion through the coercive power of government. Forbidden involvements include compelling or coercing participation or attendance at a religious activity, see *Engel* v. *Vitale*, 370 U. S. 421 (1962); *McGowan* v. *Maryland, supra,* at 452 (discussing *McCollum* v. *Board of Education of School Dist. No. 71, Champaign County, supra*), requiring religious oaths to obtain government office or benefits, *Torcaso* v. *Watkins*, 367 U. S. 488 (1961), or delegating government power to religious groups, *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982). The freedom to worship as one pleases without government interference or oppression is the great object of both the Establishment and the Free Exercise Clauses. Barring all attempts to aid religion through government coercion goes far toward attainment of this object. See *McGowan* v. *Maryland, supra,* at 441, quoting 1 Annals of Congress 730 (1789) (James Madison, who proposed the First Amendment in Congress, "'apprehended the meaning of the [Religion Clauses] to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience'"); *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940) (the Religion Clauses "forestal[l] compulsion by law of the acceptance of any creed or the practice of any form of worship").

As JUSTICE BLACKMUN observes, *ante,* at 597–598, n. 47, some of our recent cases reject the view that coercion is the sole touchstone of an Establishment Clause violation. See *Engel* v. *Vitale, supra,* at 430 (dictum) (rejecting, without citation of authority, proposition that coercion is required to demonstrate an Establishment Clause violation); *Abington School District* v. *Schempp, supra,* at 223; *Nyquist*, 413 U. S., at 786. That may be true if by "coercion" is meant

*direct* coercion in the classic sense of an establishment of religion that the Framers knew.   But coercion need not be a direct tax in aid of religion or a test oath.   Symbolic recognition or accommodation of religious faith may violate the Clause in an extreme case.[1]   I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall.   This is not because government speech about religion is *per se* suspect, as the majority would have it, but because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion.   Cf. *Friedman* v. *Board of County Comm'rs of Bernalillo County*, 781 F. 2d 777 (CA10 1985) (en banc) (Latin cross on official county seal); *American Civil Liberties Union of Georgia* v. *Rabun County Chamber of Commerce, Inc.*, 698 F. 2d 1098 (CA11 1983) (cross erected in public park); *Lowe* v. *Eugene*, 254 Ore. 518, 463 P. 2d 360 (1969) (same).   Speech may coerce in some circumstances, but this does not justify a ban on all government recognition of religion.   As Chief Justice Burger wrote for the Court in *Walz*:

> "The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion.   Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist

---

[1] JUSTICE STEVENS is incorrect when he asserts that requiring a showing of direct or indirect coercion in Establishment Clause cases is "out of step with our precedent."   *Ante*, at 650, n. 6.   As is demonstrated by the language JUSTICE STEVENS quotes from *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962), our cases have held only that *direct* coercion need not always be shown to establish an Establishment Clause violation.   The prayer invalidated in *Engel* was unquestionably coercive in an indirect manner, as the *Engel* Court itself recognized in the sentences immediately following the passage JUSTICE STEVENS chooses to quote.   *Id.*, at 430–431.

without sponsorship and without interference." 397 U. S., at 669.

This is most evident where the government's act of recognition or accommodation is passive and symbolic, for in that instance any intangible benefit to religion is unlikely to present a realistic risk of establishment. Absent coercion, the risk of infringement of religious liberty by passive or symbolic accommodation is minimal. Our cases reflect this reality by requiring a showing that the symbolic recognition or accommodation advances religion to such a degree that it actually "establishes a religion or religious faith, or tends to do so." *Lynch*, 465 U. S., at 678.

In determining whether there exists an establishment, or a tendency toward one, we refer to the other types of church-state contacts that have existed unchallenged throughout our history, or that have been found permissible in our case law. In *Lynch*, for example, we upheld the city of Pawtucket's holiday display of a crèche, despite the fact that "the display advance[d] religion in a sense." *Id.*, at 683. We held that the crèche conferred no greater benefit on religion than did governmental support for religious education, legislative chaplains, "recognition of the origins of the [Christmas] Holiday itself as 'Christ's Mass,'" or many other forms of symbolic or tangible governmental assistance to religious faiths that are ensconced in the safety of national tradition. *Id.*, at 681, 683. And in *Marsh* v. *Chambers*, we found that Nebraska's practice of employing a legislative chaplain did not violate the Establishment Clause, because "legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations." 463 U. S., at 791 (citations omitted). Noncoercive government action within the realm of flexible accommodation or passive acknowledgment of existing symbols does not violate the Establishment Clause unless it benefits religion in a way

more direct and more substantial than practices that are accepted in our national heritage.

## II

These principles are not difficult to apply to the facts of the cases before us. In permitting the displays on government property of the menorah and the crèche, the city and county sought to do no more than "celebrate the season," Brief for Petitioner County of Allegheny in No. 87–2050, p. 27, and to acknowledge, along with many of their citizens, the historical background and the religious, as well as secular, nature of the Chanukah and Christmas holidays. This interest falls well within the tradition of government accommodation and acknowledgment of religion that has marked our history from the beginning.[2] It cannot be disputed that government, if it chooses, may participate in sharing with its citizens the joy of the holiday season, by declaring public holidays, installing or permitting festive displays, sponsoring celebrations and parades, and providing holiday vacations for its employees. All levels of our government do precisely that. As we said in *Lynch*, "Government has long recognized—indeed it has subsidized—holidays with religious significance." 465 U. S., at 676.

If government is to participate in its citizens' celebration of a holiday that contains both a secular and a religious component, enforced recognition of only the secular aspect would

---

[2] The majority rejects the suggestion that the display of the crèche can "be justified as an 'accommodation' of religion," because it "does not remove any burden on the free exercise of Christianity." *Ante*, at 601, n. 51. Contrary to the assumption implicit in this analysis, however, we have never held that government's power to accommodate and recognize religion extends no further than the requirements of the Free Exercise Clause. To the contrary, "[t]he limits of permissible state accommodation to religion are by no means coextensive with the non-interference mandated by the Free Exercise Clause." *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 673 (1970). Cf. *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 38 (1989) (SCALIA, J., dissenting).

signify the callous indifference toward religious faith that our cases and traditions do not require; for by commemorating the holiday only as it is celebrated by nonadherents, the government would be refusing to acknowledge the plain fact, and the historical reality, that many of its citizens celebrate its religious aspects as well.  Judicial invalidation of government's attempts to recognize the religious underpinnings of the holiday would signal not neutrality but a pervasive intent to insulate government from all things religious.  The Religion Clauses do not require government to acknowledge these holidays or their religious component; but our strong tradition of government accommodation and acknowledgment permits government to do so.  See *Lynch* v. *Donnelly, supra;* cf. *Zorach* v. *Clauson,* 343 U. S., at 314; *Abington School District* v. *Schempp,* 374 U. S., at 306 (Goldberg, J., concurring).

There is no suggestion here that the government's power to coerce has been used to further the interests of Christianity or Judaism in any way.   No one was compelled to observe or participate in any religious ceremony or activity.  Neither the city nor the county contributed significant amounts of tax money to serve the cause of one religious faith.   The crèche and the menorah are purely passive symbols of religious holidays.   Passersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech.

There is no realistic risk that the crèche and the menorah represent an effort to proselytize or are otherwise the first step down the road to an establishment of religion.[3]   *Lynch*

---

[3] One can imagine a case in which the use of passive symbols to acknowledge religious holidays could present this danger.   For example, if a city chose to recognize, through religious displays, every significant Christian holiday while ignoring the holidays of all other faiths, the argument that the city was simply recognizing certain holidays celebrated by its citizens without establishing an official faith or applying pressure to obtain adher-

is dispositive of this claim with respect to the crèche, and I find no reason for reaching a different result with respect to the menorah. Both are the traditional symbols of religious holidays that over time have acquired a secular component. *Ante,* at 579, and n. 3, 585, and n. 29. Without ambiguity, *Lynch* instructs that "the focus of our inquiry must be on the [religious symbol] in the context of the [holiday] season," 465 U. S., at 679. In that context, religious displays that serve "to celebrate the Holiday and to depict the origins of that Holiday" give rise to no Establishment Clause concern. *Id.,* at 681. If Congress and the state legislatures do not run afoul of the Establishment Clause when they begin each day with a state-sponsored prayer for divine guidance offered by a chaplain whose salary is paid at government expense, I cannot comprehend how a menorah or a crèche, displayed in the limited context of the holiday season, can be invalid.[4]

Respondents say that the religious displays involved here are distinguishable from the crèche in *Lynch* because they are located on government property and are not surrounded

---

ents would be much more difficult to maintain. On the facts of these cases, no such unmistakable and continual preference for one faith has been demonstrated or alleged.

[4] The majority suggests that our approval of legislative prayer in *Marsh* v. *Chambers* is to be distinguished from these cases on the ground that legislative prayer is nonsectarian, while crèches and menorahs are not. *Ante,* at 603. In the first place, of course, this purported distinction is utterly inconsistent with the majority's belief that the Establishment Clause "mean[s] no official preference even for religion over nonreligion." *Ante,* at 605. If year-round legislative prayer does not express "official preference for religion over nonreligion," a crèche or menorah display in the context of the holiday season certainly does not "demonstrate a preference for one particular sect or creed." *Ibid.* Moreover, the majority chooses to ignore the Court's opinion in *Lynch* v. *Donnelly,* 465 U. S. 668 (1984), which applied *precisely the same analysis* as that I apply today: "[T]o conclude that the primary effect of including the crèche is to advance religion in violation of the Establishment Clause would require that we view it as more beneficial to and more an endorsement of religion . . . than . . . the legislative prayers upheld in *Marsh* v. *Chambers* . . . ." *Id.,* at 681–682.

by the candy canes, reindeer, and other holiday paraphernalia that were a part of the display in *Lynch*. Nothing in Chief Justice Burger's opinion for the Court in *Lynch* provides support for these purported distinctions. After describing the facts, the *Lynch* opinion makes no mention of either of these factors. It concentrates instead on the significance of the crèche as part of the entire holiday season. Indeed, it is clear that the Court did not view the secular aspects of the display as somehow subduing the religious message conveyed by the crèche, for the majority expressly rejected the dissenters' suggestion that it sought "'to explain away the clear religious import of the crèche'" or had "equated the crèche with a Santa's house or reindeer." *Id.*, at 685, n. 12. Crucial to the Court's conclusion was not the number, prominence, or type of secular items contained in the holiday display but the simple fact that, when displayed by government during the Christmas season, a crèche presents no realistic danger of moving government down the forbidden road toward an establishment of religion. Whether the crèche be surrounded by poinsettias, talking wishing wells, or carolers, the conclusion remains the same, for the relevant context is not the items in the display itself but the season as a whole.

The fact that the crèche and menorah are both located on government property, even at the very seat of government, is likewise inconsequential. In the first place, the *Lynch* Court did not rely on the fact that the setting for Pawtucket's display was a privately owned park, and it is difficult to suggest that anyone could have failed to receive a message of government sponsorship after observing Santa Claus ride the city fire engine to the park to join with the mayor of Pawtucket in inaugurating the holiday season by turning on the lights of the city-owned display. See *Donnelly* v. *Lynch*, 525 F. Supp. 1150, 1156 (RI 1981). Indeed, the District Court in *Lynch* found that "people might reasonably mistake

the Park for public property," and rejected as "frivolous" the suggestion that the display was not directly associated with the city. *Id.*, at 1176, and n. 35.

Our cases do not suggest, moreover, that the use of public property necessarily converts otherwise permissible government conduct into an Establishment Clause violation. To the contrary, in some circumstances the First Amendment may *require* that government property be available for use by religious groups, see *Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Fowler* v. *Rhode Island*, 345 U. S. 67 (1953); *Niemotko* v. *Maryland*, 340 U. S. 268 (1951), and even where not required, such use has long been permitted. The prayer approved in *Marsh* v. *Chambers*, for example, was conducted in the legislative chamber of the State of Nebraska, surely the single place most likely to be thought the center of state authority.

Nor can I comprehend why it should be that placement of a government-owned crèche on private land is lawful while placement of a privately owned crèche on public land is not.[5] If anything, I should have thought government ownership of a religious symbol presented the more difficult question under the Establishment Clause, but as *Lynch* resolved that question to sustain the government action, the sponsorship here ought to be all the easier to sustain. In short, nothing about the religious displays here distinguishes them in any meaningful way from the crèche we permitted in *Lynch*.

If *Lynch* is still good law—and until today it was—the judgment below cannot stand. I accept and indeed approve both the holding and the reasoning of Chief Justice Burger's opinion in *Lynch*, and so I must dissent from the judgment that the crèche display is unconstitutional. On the same reasoning, I agree that the menorah display is constitutional.

---

[5] The crèche in *Lynch* was owned by Pawtucket. Neither the crèche nor the menorah at issue in this case is owned by a governmental entity.

## III

The majority invalidates display of the crèche, not because it disagrees with the interpretation of *Lynch* applied above, but because it chooses to discard the reasoning of the *Lynch* majority opinion in favor of JUSTICE O'CONNOR's concurring opinion in that case.   See *ante,* at 594–597.   It has never been my understanding that a concurring opinion "suggest-[ing] a clarification of our . . . doctrine," *Lynch,* 465 U. S., at 687 (O'CONNOR, J., concurring), could take precedence over an opinion joined in its entirety by five Members of the Court.[6]   As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law. Since the majority does not state its intent to overrule *Lynch,* I find its refusal to apply the reasoning of that decision quite confusing.

Even if *Lynch* did not control, I would not commit this Court to the test applied by the majority today.   The notion that cases arising under the Establishment Clause should be decided by an inquiry into whether a " 'reasonable observer' " may " 'fairly understand' " government action to " 'sen[d] a message to nonadherents that they are outsiders, not full members of the political community,' " is a recent, and in my view most unwelcome, addition to our tangled Establishment Clause jurisprudence.   *Ante,* at 595, 620.   Although a scattering of our cases have used "endorsement" as another word for "preference" or *"imprimatur,"* the endorsement test applied by the majority had its genesis in JUSTICE O'CONNOR's concurring opinion in *Lynch.*   See also *Corporation of the Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 346 (1987) (O'CONNOR, J., concurring in judgment); *Estate of Thornton* v. *Caldor, Inc.,* 472 U. S. 703, 711 (1985) (O'CONNOR, J., concurring); *Wal-*

---

[6] The majority illustrates the depth of its error in this regard by going so far as to refer to the *concurrence* and *dissent* in *Lynch* as "[o]ur previous opinions. . . ."   *Ante,* at 602.

*lace* v. *Jaffree*, 472 U. S., at 67 (O'CONNOR, J., concurring in judgment). The endorsement test has been criticized by some scholars in the field, see, *e. g.*, Smith, Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Endorsement" Test, 86 Mich. L. Rev. 266 (1987); Tushnet, The Constitution of Religion, 18 Conn. Law Rev. 701, 711–712 (1986). Only one opinion for the Court has purported to apply it in full, see *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 389–392 (1985), but the majority's opinion in these cases suggests that this novel theory is fast becoming a permanent accretion to the law. See also *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 8–9 (1989) (opinion of BRENNAN, J.). For the reasons expressed below, I submit that the endorsement test is flawed in its fundamentals and unworkable in practice. The uncritical adoption of this standard is every bit as troubling as the bizarre result it produces in the cases before us.

## A

I take it as settled law that, whatever standard the Court applies to Establishment Clause claims, it must at least suggest results consistent with our precedents and the historical practices that, by tradition, have informed our First Amendment jurisprudence. See *supra*, at 655–663; *Lynch, supra*, at 673–674; *Marsh* v. *Chambers*, 463 U. S., at 790–791; *Walz* v. *Tax Comm'n of New York City*, 397 U. S., at 671. It is true that, for reasons quite unrelated to the First Amendment, displays commemorating religious holidays were not commonplace in 1791. See generally J. Barnett, The American Christmas: A Study in National Culture 2–11 (1954). But the relevance of history is not confined to the inquiry into whether the challenged practice itself is a part of our accepted traditions dating back to the Founding.

Our decision in *Marsh* v. *Chambers* illustrates this proposition. The dissent in that case sought to characterize the decision as "carving out an exception to the Establishment

Clause rather than reshaping Establishment Clause doctrine to accommodate legislative prayer," 463 U. S., at 796 (BRENNAN, J., dissenting), but the majority rejected the suggestion that "historical patterns ca[n] justify contemporary violations of constitutional guarantees," *id.*, at 790. *Marsh* stands for the proposition, not that specific practices common in 1791 are an exception to the otherwise broad sweep of the Establishment Clause, but rather that the meaning of the Clause is to be determined by reference to historical practices and understandings.[7] Whatever test we choose to apply must permit not only legitimate practices two centuries old but also any other practices with no greater potential for an establishment of religion. See *Committee for Public Education and Religious Liberty* v. *Nyquist*, 413 U. S., at 808 (REHNQUIST, J., dissenting in part). The First Amendment is a rule, not a digest or compendium. A test for implementing the protections of the Establishment Clause that, if applied with consistency, would invalidate longstanding traditions cannot be a proper reading of the Clause.

If the endorsement test, applied without artificial exceptions for historical practice, reached results consistent with history, my objections to it would have less force. But, as I understand that test, the touchstone of an Establishment Clause violation is whether nonadherents would be made to feel like "outsiders" by government recognition or accommodation of religion. Few of our traditional practices recognizing the part religion plays in our society can withstand scrutiny under a faithful application of this formula.

---

[7] Contrary to the majority's discussion, *ante*, at 604–605, and nn. 53–54, the relevant historical practices are those conducted by governmental units which were subject to the constraints of the Establishment Clause. Acts of "official discrimination against non-Christians" perpetrated in the 18th and 19th centuries by States and municipalities are of course irrelevant to this inquiry, but the practices of past Congresses and Presidents are highly informative.

Some examples suffice to make plain my concerns.    Since
the Founding of our Republic, American Presidents have is-
sued Thanksgiving Proclamations establishing a national day
of celebration and prayer.    The first such proclamation was
issued by President Washington at the request of the First
Congress, and "recommend[ed] and assign[ed]" a day "to
be devoted by the people of these States to the service of
that great and glorious Being who is the beneficent author
of all the good that was, that is, or that will be," so that
"we may then unite in most humbly offering our prayers and
supplications to the great Lord and Ruler of Nations, and
beseech Him to . . . promote the knowledge and practice of
true religion and virtue . . . ."    1 J. Richardson, A Com-
pilation of Messages and Papers of the Presidents, 1789–
1897, p. 64 (1899).    Most of President Washington's succes-
sors have followed suit,[8] and the forthrightly religious nature
of these proclamations has not waned with the years.    Presi-
dent Franklin D. Roosevelt went so far as to "suggest a na-
tionwide reading of the Holy Scriptures during the period
from Thanksgiving Day to Christmas" so that "we may bear
more earnest witness to our gratitude to Almighty God."
Presidential Proclamation No. 2629, 58 Stat. 1160.    It re-
quires little imagination to conclude that these proclamations
would cause nonadherents to feel excluded, yet they have
been a part of our national heritage from the beginning.[9]

---

[8] In keeping with his strict views of the degree of separation mandated
by the Establishment Clause, Thomas Jefferson declined to follow this tra-
dition.    See 11 Writings of Thomas Jefferson 429 (A. Lipscomb ed. 1904).

[9] Similarly, our Presidential inaugurations have traditionally opened
with a request for divine blessing.    At our most recent such occasion, on
January 20, 1989, thousands bowed their heads in prayer to this invocation:

"Our Father and our God, Thou hast said blessed is the nation whose
God is the Lord.

"We recognize on this historic occasion that we are a nation under God.
This faith in God is our foundation and our heritage. . . .

The Executive has not been the only Branch of our Government to recognize the central role of religion in our society. The fact that this Court opens its sessions with the request that "God save the United States and this honorable Court" has been noted elsewhere. See *Lynch,* 465 U. S., at 677. The Legislature has gone much further, not only employing legislative chaplains, see 2 U. S. C. § 61d, but also setting aside a special prayer room in the Capitol for use by Members of the House and Senate. The room is decorated with a large stained glass panel that depicts President Washington kneeling in prayer; around him is etched the first verse of the 16th Psalm: "Preserve me, O God, for in Thee do I put my trust." Beneath the panel is a rostrum on which a Bible is placed; next to the rostrum is an American Flag. See L. Aikman, We the People: The Story of the United States Capitol 122 (1978). Some endorsement is inherent in these reasonable accommodations, yet the Establishment Clause does not forbid them.

The United States Code itself contains religious references that would be suspect under the endorsement test. Congress has directed the President to "set aside and proclaim a suitable day each year . . . as a National Day of Prayer, on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U. S. C. § 169h. This statute does not require anyone to pray, of course, but it is a straightforward endorsement of the concept of "turn[ing] to God in prayer." Also by statute, the Pledge of Allegiance to the Flag describes the United States as "one Nation under God." 36 U. S. C. § 172.

"As George Washington reminded us in his Farewell Address, morality and faith are the pillars of our society. May we never forget that.

.     .     .     .     .

"We acknowledge Thy divine help in the selection of our leadership each 4 years.

.     .     .     .     .

"All this we pray in the name of the Father, the Son, and the Holy Spirit. Amen." 135 Cong. Rec. 303 (1989) (Rev. Billy Graham).

To be sure, no one is obligated to recite this phrase, see *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624 (1943), but it borders on sophistry to suggest that the " 'reasonable' " atheist would not feel less than a " 'full membe[r] of the political community' " every time his fellow Americans recited, as part of their expression of patriotism and love for country, a phrase he believed to be false. Likewise, our national motto, "In God we trust," 36 U. S. C. § 186, which is prominently engraved in the wall above the Speaker's dias in the Chamber of the House of Representatives and is reproduced on every coin minted and every dollar printed by the Federal Government, 31 U. S. C. §§ 5112(d)(1), 5114(b), must have the same effect.

If the intent of the Establishment Clause is to protect individuals from mere feelings of exclusion, then legislative prayer cannot escape invalidation. It has been argued that "[these] government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch, supra*, at 693 (O'CONNOR, J., concurring). I fail to see why prayer is the only way to convey these messages; appeals to patriotism, moments of silence, and any number of other approaches would be as effective, were the only purposes at issue the ones described by the *Lynch* concurrence. Nor is it clear to me why "encouraging the recognition of what is worthy of appreciation in society" can be characterized as a purely secular purpose, if it can be achieved only through religious prayer. No doubt prayer is "worthy of appreciation," but that is most assuredly not because it is secular. Even accepting the secular-solemnization explanation at face value, moreover, it seems incredible to suggest that the average observer of legislative prayer who either believes in no religion or whose faith rejects the concept of God would not receive the clear message that his faith is out of step with the

political norm. Either the endorsement test must invalidate scores of traditional practices recognizing the place religion holds in our culture, or it must be twisted and stretched to avoid inconsistency with practices we know to have been permitted in the past, while condemning similar practices with no greater endorsement effect simply by reason of their lack of historical antecedent.[10] Neither result is acceptable.

## B

In addition to disregarding precedent and historical fact, the majority's approach to government use of religious symbolism threatens to trivialize constitutional adjudication. By mischaracterizing the Court's opinion in *Lynch* as an endorsement-in-context test, *ante*, at 597, JUSTICE BLACKMUN embraces a jurisprudence of minutiae. A reviewing court must consider whether the city has included Santas, talking wishing wells, reindeer, or other secular symbols as "a center of attention separate from the crèche." *Ante*, at 598. After determining whether these centers of attention are sufficiently "separate" that each "had their specific visual story to tell," the court must then measure their proximity to the crèche. *Ante*, at 598, and n. 48. A community that wishes to construct a constitutional display must also

---

[10] If the majority's test were to be applied logically, it would lead to the elimination of all nonsecular Christmas caroling in public buildings or, presumably, anywhere on public property. It is difficult to argue that lyrics like "Good Christian men, rejoice," "Joy to the world! the Savior reigns," "This, this is Christ the King," "Christ, by highest heav'n adored," and "Come and behold Him, Born the King of angels" have acquired such a secular nature that nonadherents would not feel "left out" by a government-sponsored or approved program that included these carols. See W. Ehret & G. Evans, The International Book of Christmas Carols 12, 28, 30, 46, 318 (1963). We do not think for a moment that the Court will ban such carol programs, however. Like Thanksgiving Proclamations, the reference to God in the Pledge of Allegiance, and invocations to God in sessions of Congress and of this Court, they constitute practices that the Court will not proscribe, but that the Court's reasoning today does not explain.

take care to avoid floral frames or other devices that might insulate the crèche from the sanitizing effect of the secular portions of the display. *Ibid.* The majority also notes the presence of evergreens near the crèche that are identical to two small evergreens placed near official county signs. *Ante,* at 600, n. 50. After today's decision, municipal greenery must be used with care.

Another important factor will be the prominence of the setting in which the display is placed. In this case, the Grand Staircase of the county courthouse proved too resplendent. Indeed, the Court finds that this location itself conveyed an "unmistakable message that [the county] supports and promotes the Christian praise to God that is the crèche's religious message." *Ante,* at 600.

My description of the majority's test, though perhaps uncharitable, is intended to illustrate the inevitable difficulties with its application.[11] This test could provide workable guidance to the lower courts, if ever, only after this Court has decided a long series of holiday display cases, using little more than intuition and a tape measure. Deciding cases on

---

[11] JUSTICE BLACKMUN and JUSTICE O'CONNOR defend the majority's test by suggesting that the approach followed in *Lynch* would require equally difficult line drawing. *Ante,* at 606; *ante,* at 629–630 (O'CONNOR, J., concurring in part and concurring in judgment). It is true that the *Lynch* test may involve courts in difficult line-drawing in the unusual case where a municipality insists on such extreme use of religious speech that an establishment of religion is threatened. See *supra,* at 661. Only adoption of the absolutist views that either *all* government involvement with religion is permissible, or that *none* is, can provide a bright line in all cases. That price for clarity is neither exacted nor permitted by the Constitution. But for the most part, JUSTICE BLACKMUN's and JUSTICE O'CONNOR's objections are not well taken. As a practical matter, the only cases of symbolic recognition likely to arise with much frequency are those involving simple holiday displays, and in that context *Lynch* provides unambiguous guidance. I would follow it. The majority's test, on the other hand, demands the Court to draw exquisite distinctions from fine detail in a wide range of cases. The anomalous result the test has produced here speaks for itself.

the basis of such an unguided examination of marginalia is irreconcilable with the imperative of applying neutral principles in constitutional adjudication. "It would be appalling to conduct litigation under the Establishment Clause as if it were a trademark case, with experts testifying about whether one display is really like another, and witnesses testifying they were offended—but would have been less so were the crèche five feet closer to the jumbo candy cane." *American Jewish Congress* v. *Chicago*, 827 F. 2d 120, 130 (CA7 1987) (Easterbrook, J., dissenting).

JUSTICE BLACKMUN employs in many respects a similar analysis with respect to the menorah, principally discussing its proximity to the Christmas tree and whether "it is . . . more sensible to interpret the menorah in light of the tree, rather than vice versa." *Ante,* at 617; see also *ante,* at 635 (O'CONNOR, J., concurring in part and concurring in judgment) (concluding that combination of tree, menorah, and salute to liberty conveys no message of endorsement to reasonable observers). JUSTICE BLACKMUN goes further, however, and in upholding the menorah as an acknowledgment of a holiday with secular aspects emphasizes the city's lack of "reasonable alternatives that are less religious in nature." *Ante,* at 618; see *ibid.* (noting absence of a "more secular alternative symbol"). This least-religious-means test presents several difficulties.[12] First, it creates an internal inconsistency in JUSTICE BLACKMUN's opinion. JUSTICE BLACKMUN earlier suggests that the display of a crèche is sometimes constitutional. *Ante,* at 598. But it is obvious that there are innumerable secular symbols of Christmas, and that there will always be a more secular alternative available in place of a crèche. Second, the test as applied by JUSTICE BLACKMUN is unworkable, for it requires not only that the Court engage in the unfamiliar task of deciding whether a particular alterna-

---

[12] Of course, a majority of the Court today rejects JUSTICE BLACKMUN's approach in this regard. See *ante,* at 636–637 (O'CONNOR, J., concurring in part and concurring in judgment).

tive symbol is more or less religious, but also whether the alternative would "look out of place." *Ante*, at 618. Third, although JUSTICE BLACKMUN purports not to be overruling *Lynch*, the more-secular-alternative test contradicts that decision, as it comes not from the Court's opinion, nor even from the concurrence, but from the dissent. See 465 U. S., at 699 (BRENNAN, J., dissenting). The Court in *Lynch* noted that the dissent "argues that the city's objectives could have been achieved without including the crèche in the display." *Id.*, at 681, n. 7. "True or false," we said, "that is irrelevant."

The result the Court reaches in these cases is perhaps the clearest illustration of the unwisdom of the endorsement test. Although JUSTICE O'CONNOR disavows JUSTICE BLACKMUN's suggestion that the minority or majority status of a religion is relevant to the question whether government recognition constitutes a forbidden endorsement, *ante*, at 634 (O'CONNOR, J., concurring in part and concurring in judgment), the very nature of the endorsement test, with its emphasis on the feelings of the objective observer, easily lends itself to this type of inquiry. If there be such a person as the "reasonable observer," I am quite certain that he or she will take away a salient message from our holding in these cases: the Supreme Court of the United States has concluded that the First Amendment creates classes of religions based on the relative numbers of their adherents. Those religions enjoying the largest following must be consigned to the status of least favored faiths so as to avoid any possible risk of offending members of minority religions. I would be the first to admit that many questions arising under the Establishment Clause do not admit of easy answers, but whatever the Clause requires, it is not the result reached by the Court today.

## IV

The approach adopted by the majority contradicts important values embodied in the Clause. Obsessive, implacable resistance to all but the most carefully scripted and secu-

larized forms of accommodation requires this Court to act as a censor, issuing national decrees as to what is orthodox and what is not. What is orthodox, in this context, means what is secular; the only Christmas the State can acknowledge is one in which references to religion have been held to a minimum. The Court thus lends its assistance to an Orwellian rewriting of history as many understand it. I can conceive of no judicial function more antithetical to the First Amendment.

A further contradiction arises from the majority's approach, for the Court also assumes the difficult and inappropriate task of saying what every religious symbol means. Before studying these cases, I had not known the full history of the menorah, and I suspect the same was true of my colleagues. More important, this history was, and is, likely unknown to the vast majority of people of all faiths who saw the symbol displayed in Pittsburgh. Even if the majority is quite right about the history of the menorah, it hardly follows that this same history informed the observers' view of the symbol and the reason for its presence. This Court is ill equipped to sit as a national theology board, and I question both the wisdom and the constitutionality of its doing so. Indeed, were I required to choose between the approach taken by the majority and a strict separationist view, I would have to respect the consistency of the latter.

The suit before us is admittedly a troubling one. It must be conceded that, however neutral the purpose of the city and county, the eager proselytizer may seek to use these symbols for his own ends. The urge to use them to teach or to taunt is always present. It is also true that some devout adherents of Judaism or Christianity may be as offended by the holiday display as are nonbelievers, if not more so. To place these religious symbols in a common hallway or sidewalk, where they may be ignored or even insulted, must be distasteful to many who cherish their meaning.

For these reasons, I might have voted against installation of these particular displays were I a local legislative official. But we have no jurisdiction over matters of taste within the realm of constitutionally permissible discretion. Our role is enforcement of a written Constitution. In my view, the principles of the Establishment Clause and our Nation's historic traditions of diversity and pluralism allow communities to make reasonable judgments respecting the accommodation or acknowledgment of holidays with both cultural and religious aspects. No constitutional violation occurs when they do so by displaying a symbol of the holiday's religious origins.